**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER VILLA, | ) | |
| | ) | Case No. |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| ANTHONY NORADIN, SAMUEL CIRONE, | ) | |
| WILLIAM BROGAN, DENIS WALSH, | ) | |
| JOEL KELLER, JOHN GRAHAM, ALBERT | ) | |
| PEREZ, DONALD FALK, JAMES GILGER, | ) | |
| JOHN HILLMAN, TIMOTHY | ) | |
| MCDERMOTT, MARC LEAVITT, | ) | |
| HECTOR ALVAREZ, JOHN FOLINO, | ) | **JURY TRIAL DEMANDED** |
| MAURIZIO INZERRA, DEMOSTHEN | ) | |
| BALODIMAS, GARY YAMASHIROYA, | ) | |
| CHRISTOPHER KENNEDY, JAMES | ) | |
| SANCHEZ, MATTHEW CLINE, CHARLES | ) | |
| DALY, ED ZABLOCKI, GERRY | ) | |
| MCCARTHY, NICHOLAS ROTI, JOSEPH | ) | |
| GORMAN, SCOTT DEDORE, MICHAEL | ) | |
| DYRA, MICHAEL NUNEZ, JOEL BEMIS, | ) | |
| SCOTT KORHONEN, JOHN ESCALANTE, | ) | |
| LEO SCHMITZ, SHEAMUS FERGUS, | ) | |
| ROBERT BARTIK, RICHARD GREEN, | ) | |
| NICHOLAS SPANOS, the CITY OF | ) | |
| CHICAGO, FRANCO DOMMA, NANCY | ) | |
| ADDUCI, ANDREW VARGA, JOHN | ) | |
| BRASSIL, and COOK COUNTY, DON | ) | |
| GUILIANO, the VILLAGE of FRANKLIN | ) | |
| PARK. | ) | |
| | ) | |
| *Defendants*. | ) | |

**COMPLAINT**

Plaintiff Alexander Villa, by his attorneys Loevy & Loevy and Jennifer Blagg, complains

of Defendants Anthony Noradin, Samuel Cirone, William Brogan, Denis Walsh, Joel Keller,

John Graham, Albert Perez, Donald Falk, James Gilger, John Hillman, Timothy McDermott,

Marc Leavitt, Hector Alvarez, John Folino, Maurizio Inzerra, Demosthen Balodimas, Gary

Yamashiroya, Christopher Kennedy, James Sanchez, Matthew Cline, Charles Daly, Ed Zablocki, Gerry McCarthy, Nicholas Roti, Joseph Gorman, Scott Dedore, Michael Dyra, Michael Nunez, Joel Bemis, Scott Korhonen, John Escalante, Leo Schmitz, Sheamus Fergus, Robert Bartik, Richard Green, Nicholas Spanos, the City of Chicago, Franco Domma, Nancy Adduci, Andrew Varga, John Brassil, Cook County, Don Guiliano, the Village of Franklin Park, and as-yet unknown employees of the City of Chicago, Cook County, and the Village of Franklin Park and states as follows:

## INTRODUCTION

1.      Plaintiff Alexander Villa spent over 8 years in prison for a crime he did not commit, the 2011 tragic shooting of Chicago police officer Clifton Lewis.

2.      Plaintiff had nothing to do with the murder. Not one piece of physical evidence connected Plaintiff to the shooting.

3.      Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on evidence purposely manufactured by the Defendant Officers. The Defendant Officers perpetuated a wide-ranging scheme to manufacture evidence to ensure the convictions of Plaintiff and two other men, Edgardo Colon and Tyrone Clay.

4.      Defendant Officers' scheme did not come to light until Plaintiff's post-trial attorneys uncovered reams of evidence that showed Defendant Officers had specifically targeted Plaintiff after they were unable to coerce a false confession from him. Defendant Officers suppressed exculpatory evidence and fabricated inculpatory evidence, all in an attempt to frame Plaintiff.

5.      Defendant Officers created an undercover investigation through the Chicago Police Department's gang unit to investigate Officer Lewis's murder and frame Plaintiff. The

Defendant Officers' investigative team became known as "Operation Snake Doctor," an operation that targeted Plaintiff and the Spanish Cobra street gang. As part of the undercover investigation, Defendant Officers fabricated inculpatory witness statements and suppressed an incredible amount of exculpatory evidence, including information about alternate suspects and alternate motives.

6.     In addition, Defendant Officers also fabricated false confessions from Colon, Clay, and another alleged witness, Melvin DeYoung, who all falsely implicated Plaintiff in the crime. Each of these false statements was the result of overwhelming coercion.

7.     As a result of the incessant and extensive efforts to frame him for the Lewis murder, Plaintiff was convicted based on false and fabricated evidence and spent 8 years in prison. It was not until his post-trial proceedings that Plaintiff became aware of just how widespread Defendant Officers' conspiracy to frame him had been.

8.     On October 2, 2024, the Cook County State's Attorney agreed Plaintiff's conviction should be vacated and dismissed the charges against him.

9.     This is far from the first time the Chicago Police Officer Defendants have committed serious misconduct during their employment with the Chicago Police Department. Plaintiff's wrongful conviction is part of a much larger pattern of corruption and a culture of misconduct within the Chicago Police Department.

10.     Plaintiff now seeks justice for the harm that Defendants have caused and redress for the loss of liberty and terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the Constitution.

12.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

14.     Plaintiff Alexander Villa spent 8 years wrongfully incarcerated for a crime he did not commit.

15.     At all times relevant to the events described in this Complaint, Defendants Anthony Noradin, Samuel Cirone, William Brogan, Denis Walsh, Joel Keller, John Graham, Albert Perez, Donald Falk, James Gilger, John Hillman, Timothy McDermott, Marc Leavitt, Hector Alvarez, John Folino, Maurizio Inzerra, Demosthen Balodimas, Gary Yamashiroya, Christopher Kennedy, James Sanchez, Matthew Cline, Charles Daly, Ed Zablocki, Gerry McCarthy, Nicholas Roti, Joseph Gorman, Scott Dedore, Michael Dyra, Michael Nunez, Joel Bemis, Scott Korhonen, John Escalante, Leo Schmitz, Sheamus Fergus, Robert Bartik, Richard Green, Nicholas Spanos, and other unknown law enforcement officers were police officers in the Chicago Police Department ("Chicago Police Officer Defendants"), acting under color of law and within the scope of their employment for the City of Chicago.

4

16.     While some of Chicago Police Officer Defendants, including Defendant William Brogan and Maurizio Inzerra, may have participated in the FBI Joint Task Force with the Chicago Police Department, they were police officers in the Chicago Police Department, acting under color of law and within the scope of their employment for the City of Chicago during all times relevant to the events described in this Complaint.

17.     At all relevant times, Defendant Franco Domma and other unknown law enforcement officers were officers in the Cook County Sheriff's Office ("Cook County Sheriff Officer Defendants"), acting under color of law and within the scope of their employment for Cook County.

18.     At all relevant times, Defendant Don Guiliano and other unknown law enforcement officers were officers in the Village of Franklin Park Police Department ("Franklin Park Police Officer Defendants"), acting under color of law and within the scope of their employment for the Village of Franklin Park.

19.     The Chicago Police Officer Defendants, Franklin Park Police Officer Defendants, and Cook County Sheriff Officer Defendants are referred to collectively as the "Defendant Officers" throughout this complaint.

20.     At all times relevant to the events described in this complaint, Defendant Anthony Noradin, Samuel Cirone, Denis Walsh, Maurizio Inzerra, Gary Yamashiroya, Christopher Kennedy, James Sanchez, Matthew Cline, Gerry McCarthy, Nicholas Roti, Joseph Gorman, Scott Dedore, Michael Nunez, John Escalante, Leo Schmitz, and other unknown law enforcement officers supervised the Defendant Officers. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

21. At all relevant times, Defendant Nancy Adduci, Andrew Varga, and John Brassil were Assistant Cook County State's Attorneys. They are sued for actions they undertook in their capacity as investigators and without probable cause to believe that Plaintiff had committed any crime. These defendants are referred to as "ASA Defendants" throughout this Complaint.

22. The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Chicago Police Officer Defendants. Each of the Chicago Police Officer Defendants named in this Complaint acted during their investigation of the Lewis murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Chicago Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

23. Defendant Cook County is a governmental entity within the State of Illinois that consists, in part, of its Cook County Sheriff's Office and Cook County State's Attorney's Office and was at all relevant times the employer of the Cook County Sheriff Officer Defendants, as well as the ASA Defendants. Defendant Cook County is a necessary party to this lawsuit because Defendant Cook County is responsible for paying any judgment entered against the Cook County Sheriff Officer Defendants and/or the ASA Defendants, employed by the Cook County Sheriff's Office and Cook County State's Attorney's Office, respectively.

24. The Village of Franklin Park is an Illinois municipal corporation that is or was the employer of the above-named Franklin Park Police Officer Defendants. Each of the Franklin Park Police Officer Defendants named in this Complaint acted during their investigation of the Lewis murder as agents or employees of the Village of Franklin Park. The Village of Franklin

Park is liable for all torts committed by the Franklin Park Police Officer Defendants pursuant to the doctrine of *respondeat superior*.

25.     Each and every individual Defendant, known and unknown, acted under the color of law and within the scope of their employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in their individual capacity unless otherwise noted.

## FACTS
### The Crime

26.     At around 8:30 p.m. on December 29, 2011, two masked men walked into the M&M Quick Mart on the west side of Chicago. Officer Clifton Lewis and another officer, Craig Williams, often worked off-duty security at the store.

27.     Almost immediately upon entering the store, the men shot and killed Lewis, who was working security that night. The robbers fled the scene after taking cash and Lewis's weapon.

28.     The death of Lewis was a tragedy and solving the crime immediately became a top priority for law enforcement in Chicago.

### The Initial Investigation

29.     A few days after the murder, police stopped Edgardo Colon for driving the wrong way down a one-way street. After finding a handgun in Colon's car, Colon was taken to the station and questioned about Lewis's murder.

30.     For more than two days, Defendant Officers interrogated Colon and coerced him into giving false inculpatory statements against Plaintiff and several other individuals, including himself.

31.     Defendant Officers knew that Colon's statements implicating Plaintiff were false but fabricated the false inculpatory evidence against Plaintiff anyway.

32. Colon's statement was entirely fabricated by the Defendant Officers. Following Colon's false confession, the Defendant Officers arrested Clay, DeYoung, and Plaintiff.

33. Defendant Officers then proceeded to interrogate one of the men that Colon was forced to falsely implicate in the shooting, Melvin DeYoung. Defendant Officers fabricated DeYoung's statements falsely implicating Plaintiff, Clay, and Colon in order to frame Plaintiff. DeYoung, a diabetic, had to be taken to the hospital multiple times throughout his interrogations.

34. Defendant Officers knew that DeYoung's statements implicating Plaintiff were false but fabricated the false inculpatory evidence against Plaintiff anyway.

35. At Plaintiff's trial, DeYoung recanted his earlier testimony implicating Plaintiff and testified that he had given the false testimony because of Defendant Officers' coercion.

36. Defendant Officers also fabricated a false statement from Tyrone Clay in order to implicate Plaintiff. Defendant Officers coerced Clay—who had an alibi—over two days to give a false statement implicating Plaintiff. Clay, who was nineteen and has serious intellectual disabilities, was forced by Defendant Officers to give a false statement implicating himself and Plaintiff. Like Colon and DeYoung, Clay gave a false statement implicating Plaintiff only after days of coercion and pressure by the Defendant Officers.

37. Defendant Officers fabricated Clay's false statements implicating Plaintiff and knew that his coerced statements were false.

38. Defendant Officers also interrogated Plaintiff over a period of days. Prior to the interrogation, Defendant Officers physically abused Plaintiff so severely that he was coughing up blood. Plaintiff, however, continually told the truth—that he was innocent and had nothing to do with the Lewis murder.

39.     After Defendant Officers fabricated Colon, Clay, and DeYoung's statements via coercive interrogations, Colon and Clay were charged with first-degree murder, armed robbery, and aggravated battery. Plaintiff was released.

**Operation Snake Doctor**

40.     After fabricating Colon, Clay, and DeYoung's statements, Defendant Officers remained determined to frame Plaintiff and worked together to do so. Defendant Officers eventually deemed this effort "Operation Snake Doctor."

41.     As part of the operation, Defendant Officers initiated a widespread campaign to interview anyone in Chicago with any relationship to Clay, Colon, and Plaintiff—particularly members of the Spanish Cobras, a gang Defendant Officers believed Plaintiff had connections to.

42.     Defendant Officers arrested dozens of people and searched their homes to try and fabricate evidence against Plaintiff. In addition to working to fabricate witness statements, Defendant Officers told these witnesses that Plaintiff was the reason they had been arrested, purposely putting Plaintiff's life in danger.

43.     Defendant Officers credited Operation Snake Doctor when Plaintiff was stabbed by Spanish Cobras in apparent retaliation.

44.     Defendant Officers eventually fabricated three different witness statements as part of their mission to frame Plaintiff.

45.     These three witnesses—Destiny Perez, Destiny Rodriguez, and Ruben Rodriguez—all claimed that they heard Plaintiff take responsibility for the Lewis murder. These three statements—and the witnesses' testimony at trial—were entirely fabricated by Defendant Officers.

46.     At the same time Defendant Officers were fabricating evidence to frame Plaintiff, they also identified alternative suspects, alternative motives, and took investigative steps that uncovered exculpatory evidence, none of which were ever disclosed.

47.     Defendant Officers employed such tactics, knowing full well that they were likely to lead to Plaintiff's wrongful prosecution and conviction.

### Fabrication of Cell Phone Tower Maps by ASA Defendants

48.     In addition to and separate from the steps taken by the Defendant Officers to frame Plaintiff, the ASA Defendants, acting in their capacity as investigators, fabricated cell phone tower map evidence in order to frame Plaintiff.

49.     The ASA Defendants fabricated inculpatory cell phone tower map evidence in order to frame Plaintiff, even though the ASA Defendants knew the evidence was false.

### Plaintiff's Wrongful Conviction and Imprisonment

50.     As a result of the misconduct and based on the false evidence described in this Complaint, Plaintiff was arrested, prosecuted, and convicted of murder.

51.     There was no physical evidence of any kind linking Plaintiff to the crime.

52.     When Defendants framed Plaintiff, they knew that Plaintiff had not committed the crime and that Plaintiff was innocent. Defendants could have closed the case and released Plaintiff, at no cost to them whatsoever. Instead, Defendants chose to fabricate and suppress evidence, all in the name of obtaining a wrongful conviction against an innocent man.

53.     The foreseeable consequences of the Defendants actions were that Plaintiff would be wrongfully convicted of the Lewis murder. Indeed, the very purpose of Defendants' actions was to frame Plaintiff, an innocent man, for a crime he did not commit.

54. The case against Plaintiff was based entirely on the false and fabricated evidence discussed above.

55. Without the fabricated evidence the Defendant Officers created, and Defendant Officers' destruction and suppression of evidence of Plaintiff's innocence, Plaintiff would never have been convicted.

56. Independently, without the ASA Defendants' fabricated inculpatory map evidence, Plaintiff would never have been convicted.

57. Plaintiff was convicted on all charges and sentenced to life imprisonment.

58. Plaintiff spent 8 years in prison as a result, consumed by the horror of his wrongful imprisonment and fearing he would never be released.

59. Plaintiff missed years with his family and friends, time that was key to building and maintaining his relationships. Plaintiff lost family members during his wrongful incarceration and will never be able to get that time back. Plaintiff was deprived of all the basic pleasures of human experience all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being. He never knew whether the truth would come out or if he would ever be exonerated.

60. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Plaintiff continues to suffer extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

61. Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

62.     Plaintiff never stopped fighting to prove his innocence, even after his conviction.

63.     In September 2022, Plaintiff filed a motion for a new trial based on the reams of exculpatory evidence—including evidence related to Operation Snake Doctor—Plaintiff's post-trial counsel had uncovered only after Plaintiff's conviction.

64.     In August 2023, Plaintiff's motion for a new trial was denied and he was sentenced to life in prison.

65.     Following the discovery of additional exculpatory evidence, the State agreed that Plaintiff's conviction should be vacated and dismissed the charges against him on October 2, 2024. Plaintiff was then released.

66.     At the time of his release, Plaintiff had spent 8 years in prison for a crime he did not commit.

**Chicago's Policy and Practice of Wrongfully Convicting Innocent Persons in Violation of the Constitution**

67.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

68.     Since the 1980s, more than a hundred cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

69.     These cases include many in which Chicago police officers used the same tactics that Chicago Police Officer Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to

influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

70. At all relevant times, members of the Chicago Police Department, including the Chicago Police Officer Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

71. Consistent with the municipal policy and practice described in the previous paragraph, employees of the City of Chicago, including the named Chicago Police Officer Defendants, concealed exculpatory evidence from Plaintiff.

72. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.); and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

73. The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

74.    In addition, a set of clandestine files related to homicides was found in *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). These files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

75.    The policy and practice of suppressing exculpatory and/or impeaching evidence was alive and well at all relevant times, including during the investigation at issue here.

76.    In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced statements long before the events at issue in this case.

77.    This history goes back at minimum to the 1980s and has continued well into the 200s and includes the conduct of infamous Chicago Police Detectives including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, and many others. In many cases, these and other Chicago Police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions and statements from suspects and witnesses, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

78.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

14

79.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

80.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

81.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco, and Firearms, who brought allegations of rampant criminal misconduct among Gangs Crimes officers—the division of the Chicago Police Department that many of the Chicago Police Officer Defendants belonged to—to the attention of CPD officials.

82.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

83.     The Code of Silence is so pervasive that, as in this case, it often involves other law enforcement officers and agencies, like the Cook County Sheriff's Office, the Franklin Park police, and the Felony Review Unit of the Cook County State's Attorney's Office.

84.     As a result of the City of Chicago's established practices, officers (including the Chicago Police Officer Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

85.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline officers, it is apparent that the Chicago Police Officer Defendants engaged in such misconduct because they had every reason to believe that the City of Chicago and its Police Department condoned such behavior.

86.     The City of Chicago and its Police Department also failed in the years prior to Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.  The conduct of live lineup, photographic, and other identification procedures;

b.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

c.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

    d.   The risks of wrongful convictions and the steps police officers should take to minimize risks;

    e.   The risks of engaging in tunnel vision during the investigation; and

    f.   The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

87.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

88.    The City's failure to train, supervise, and discipline its officers, including the Chicago Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

89.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

90.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

## Defendant Officers' History of Misconduct

91.     Many of the Chicago Police Officer Defendants that were involved in the framing of Plaintiff have a long history of misconduct.

92.     Several of the Chicago Police Officer Defendants—including Defendant Samuel Cirone, Defendant Denis Walsh, and Defendant James Gilger—fabricated reports and suppressed evidence in an investigation into the death of David Koschman, in order to protect a politically connected suspect—the nephew of then-mayor Richard M. Daley.

93.     Defendant Noradin was reprimanded by the Chicago Police Department for stalking and harassing an ex-girlfriend.

94.     Defendant William Brogan coerced Donald Williams into falsely confessing to a murder he did not commit. Williams eventually had the false confession suppressed and the homicide charges were dropped—only after he spent three years in Cook County Jail as a result of Defendant Brogan's coercion.

95.     Defendant Timothy McDermott was fired by the Chicago Police Board for holding a rifle and posing with a Black suspect wearing antlers.

96.     Defendant Robert Bartik has been sued several times for his misconduct as a police officer and polygrapher, specifically for routinely fabricating supposed confessions from suspects.

97.     Collectively, the Chicago Police Officer Defendants have been named in over a dozen civil lawsuits related to misconduct during their employment with the Chicago Police Department, costing the City tens of millions of dollars.

98.     The Chicago Police Officer Defendants' framing of Plaintiff was the latest in a long line of egregious misconduct, consistent with their complete disregard for the constitutional and civil rights of civilians.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

99.     Plaintiff incorporates each paragraph of this complaint as if fully restated.

100.     As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

101.     In the manner described more fully above, the Defendant Officers fabricated witness statements falsely implicating Plaintiff in the crime.

102.     The Defendant Officers knew this evidence was false.

103.     The Defendant Officers obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

104.     The Defendant Officers procured witness statements implicating Plaintiff which they knew to be false. Despite this, they caused these statements to be used during Plaintiff's criminal trial.

105.     In addition, the Defendant Officers deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that they had manufactured the false statements implicating Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

106.    In addition, based upon information and belief, the Defendant Officers concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

107.    The Defendant Officers' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

108.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

109.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

110.    The misconduct described in this Count was undertaken by the Chicago Police Officer Defendants pursuant to the policy and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT II**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

111.    Plaintiff incorporates each paragraph of the complaint as if fully restated here.

112.    In the manner described above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable

cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

113.    In so doing, these Defendant Officers maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

114.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

115.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain, suffering, and other grievous and continuing injuries and damages as set forth above.

116.    The misconduct of the Chicago Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

117.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

118.    In the manner described above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

119.    The Defendant Officers had ample, reasonable opportunities, as well as the duty, to prevent this harm, but they failed to do so.

120.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and was in total disregard of the truth and Plaintiff's clear innocence.

121.     As a result of Defendant Officers' misconduct as described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

122.     The misconduct of the Chicago Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

123.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

124.     In the manner described more fully above, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Lewis shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

**COUNT V**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

125.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

126.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

127.    At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

128.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Chicago Police Officer Defendants.

129.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated witness statements.

130.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects, such as Clay, Colon, and DeYoung, were coerced to

involuntarily implicate themselves and others, like Plaintiff, by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

131. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

132. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged

and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

133.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

134.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

135.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

136.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Chicago Police Officer Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VI
### State Law Claim – Malicious Prosecution

137.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

138.    In the manner described above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their

employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

139.    In so doing, the Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

140.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in October 2024.

141.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

142.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII**
**State Law Claim – Intentional Infliction of Emotional Distress**

143.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

144.    The actions, omissions, and conduct of the Defendant Officers as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

145.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
## State Law Claim – Willful and Wanton Conduct

146.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

147.    At all times relevant to this complaint the Defendant Officers had a duty to refrain from willful and wanton conduct in connection with the Lewis murder investigation.

148.    As described in the complaint, it was foreseeable to Defendant Officers that fabricating evidence and suppressing exculpatory evidence, in addition to the other misconduct alleged in this complaint, in order to frame Plaintiff, would inevitably result in extreme harm to him. Avoiding this injury to Plaintiff would not have burdened Defendant Officers in any way.

149.    Notwithstanding that duty, the Defendant Officers acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

150.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Civil Conspiracy

151.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

152.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

153.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

154.     The violations of Illinois law described in this complaint, including Defendant Officers' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendant Officers' conspiracy.

155.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

156.     As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

157.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

158.     While committing the misconduct alleged in the preceding paragraphs, the Chicago Police Officer Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

159.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

160.    While committing the misconduct alleged in the preceding paragraphs, the Franklin Park Police Officer Defendants were employees, members, and agents of the Village of Franklin Park, acting at all relevant times within the scope of their employment.

161.    Defendant Village of Franklin Park is liable as principal for all torts committed by its agents.

162.    While committing the misconduct alleged in the preceding paragraphs, the Cook County Sheriff Officer Defendants were employees, members, and agents of the Cook County Sheriff's Office and Cook County, acting at all relevant times within the scope of their employment.

163.    Defendant Cook County is liable as principal for all torts committed by the Cook County Sheriff Officer Defendants.

### COUNT XII
### 42 U.S.C. § 1983 – Due Process Against ASA Defendants Only
### (Fourteenth Amendment)

164.    Plaintiff incorporates each paragraph of this complaint as if fully restated.

165.    As described in detail above, the ASA Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, and in their capacity as investigators, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

166.    In the manner described more fully above, the ASA Defendants fabricated cell phone tower maps falsely implicating Plaintiff in the crime.

167.    The ASA Defendants knew this evidence was false.

168.    The ASA Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

169.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

170.    As a result of the ASA Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

## COUNT XIII
### State Law Claim – Indemnification

171.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

172.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

173.    The Chicago Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

174.    Defendant City of Chicago is responsible to pay any judgment entered against the Chicago Police Officer Defendants.

175.    The Franklin Park Police Officer Defendants were employees, members, and agents of Defendant Village of Franklin Park, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

176.     Defendant Village of Franklin Park is responsible to pay any judgment entered against the Franklin Park Police Officer Defendants.

177.     Defendant Domma and the ASA Defendants were employees of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

178.     Defendant Cook County is responsible to pay any judgment entered against Defendant Domma and/or the ASA Defendants.

WHEREFORE, Plaintiff ALEXANDER VILLA, respectfully requests that this Court enter a judgment in his favor and against Defendants Anthony Noradin, Samuel Cirone, William Brogan, Denis Walsh, Joel Keller, John Graham, Albert Perez, Donald Falk, James Gilger, John Hillman, Timothy McDermott, Marc Leavitt, Hector Alvarez, John Folino, Maurizio Inzerra, Demosthen Balodimas, Gary Yamashiroya, Christopher Kennedy, James Sanchez, Matthew Cline, Charles Daly, Ed Zablocki, Gerry McCarthy, Nicholas Roti, Joseph Gorman, Scott Dedore, Michael Dyra, Michael Nunez, Joel Bemis, Scott Korhonen, John Escalante, Leo Schmitz, Sheamus Fergus, Robert Bartik, Richard Green, Nicholas Spanos, the City of Chicago, Franco Domma, Nancy Adduci, Andrew Varga, John Brassil, Cook County, Don Guiliano, the Village of Franklin Park, and as-yet unknown employees of the City of Chicago, Cook County, and the Village of Franklin Park, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ALEXANDER VILLA, hereby demands a trial by jury pursuant to Rule of Civil Procedure 38(b) on all issues so triable.

Dated: February 25, 2025                    Respectfully submitted,

                                            **ALEXANDER VILLA**

                                            BY:     /s/ Jordan Poole
                                                    *One of Plaintiff's Attorneys*

Jon Loevy
Steve Art
Anand Swaminathan
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
poole@loevy.com


Jennifer Blagg
1509 W. Berwyn Ave. Suite 201E
Chicago, Illinois 60640
(773) 859-0081
jennifer@blagglaw.net