# EXHIBIT 2

1

```
                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION


  ALEXANDER VILLA,                    )  Case No. 23 C 16798
                                      )
                        Plaintiff,    )
                                      )
                vs.                   )
                                      )  Chicago, Illinois
  ANTHONY F. NORADIN,                 )  August 5, 2025
                                      )  9:41 a.m.
                        Defendant.    )

                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE MATTHEW F. KENNELLY


  APPEARANCES:


  For Plaintiff
  Alexander Villa:         BLAGG LAW
                           BY:  MS. JENNIFER LYNNE BLAGG
                           1333 W. Devon Avenue
                           Chicago, Illinois  60660



                           LOEVY & LOEVY
                           BY:  MR. JOHATHAN I. LOEVY
                           311 N. Aberdeen, 3rd Floor
                           Chicago, Illinois 60607




  Court Reporter:          MS. CAROLYN R. COX, RPR, CRR, FCRR
                           Official Court Reporter
                           219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
                           (312) 435-5639
                           C.Cox.courtreporter@gmail.com


                        *    *    *    *    *

               PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

APPEARANCES (Cont'd):

For Defendants
Anthony F. Noradin,
et al:                    BORKAN & SCAHILL LTD
                          BY:  MR. GRAHAM P. MILLER
                          20 S. Clark St., Suite 1700
                          Chicago, Illinois  60603

For Defendants
Andrew Varga
And Nancy Adduci:         O'CONNOR & BATTLE, LLP IL
                          BY:  MR. KENNETH M. BATTLE
                          111 W. Jackson Boulevard, Suite 1700
                          Chicago, IL 60604

For the Defendant
City of Chicago:          NATHAN & KAMIONSKI LLP
                          BY:  MS. KATHRYN M. DOI
                          206 S. Jefferson Street
                          Chicago, Illinois 60661

APPEARANCES (Cont'd):


For Defendant
Cook County:                COOK COUNTY STATE'S ATTORNEY'S OFFICE
                            BY:  MR. JOSEPH A. HODAL
                            50 W. Washington Street, 5th Floor
                            Chicago, Illinois 60602


For Defendant
Gerry McCarthy:             MOHAN GROBLE SCOLARO, P.C.
                            BY:  MR. LAWRENCE S. KOWALCZYK
                                 MR. ERIC S. PALLES
                                 MR. JACK RUGGIERO
                            55 W. Monroe, Suite 1600
                            Chicago, Illinois 60603


For Defendants
Don Guiliano and
Village of Franklin
Park:                       MONTANA & WELCH, LLC
                            BY:  MR. THOMAS JOSEPH CONDON, JR.
                            11950 S. Harlem Avenue, Suite 102
                            Palos Heights, Illinois 60463



For the Government:         UNITED STATES ATTORNEYS' OFFICE
                            BY:  MS. ERIKA L. CSICSILA
                            219 S. Dearborn Street
                            Chicago, Illinois 60604

4

(Proceedings had in open court:)

THE CLERK:  Case 25 C 1968, Villa v. Noradin.

THE COURT:  So just find a spot that you're comfortable standing in, and we'll just kind of go across the room from this side to that side.  There's no imaginary dividing line down the middle of the room.

MR. LOEVY:  Jon Loevy for the plaintiff, your Honor.

MS. BLAGG:  Jennifer Blagg for the plaintiff.

THE COURT:  All right.  Go ahead.

MS. DOI:  Kathryn Doi on behalf of the City of Chicago.

MR. MILLER:  Graham Miller on behalf of the individual CPD officers other than McCarthy.

MR. PALLES:  Eric Palles on behalf of Gerry McCarthy.

MR. RUGGIERO:  Jack Ruggiero on behalf of Gerry McCarthy.

MR. KOWALCZYK:  Larry Kowalczyk for Gerry McCarthy.

MR. BATTLE:  Ken Battle on behalf of Adduci and Varga.

MS. CSICSILA:  Erika Csicsila on behalf of the United States.

MR. CONDON:  Tom Condon --

THE COURT:  Say it louder.

MR. CONDON:  Tom Condon on behalf of Franklin Park and Guiliano.

MR. HODAL:  Joseph Hodal, H-O-D-A-L, on behalf of Cook

County.

THE COURT: Anybody that seems like they're missing?

MR. HODAL: Yeah, Hinshaw, who represents Brassil and Domma.

THE COURT: So we're not doing it early. We're right on time.

So I think what I'd like to start with is Ms. Csicsila's thing since she's not otherwise involved in stuff. I have a bunch of questions.

So do you know, Ms. Csicsila, when this material got produced to the police department or the city in the first instance, ballpark?

MS. CSICSILA: The underlying material is related to a joint investigation. I say joint investigation. It was a federal investigation --

THE COURT: With a task force basically.

MS. CSICSILA: -- involving CPD officers.

THE COURT: Were they getting the stuff -- the stuff that's at issue here, were they getting it contemporaneously with its preparation?

MS. CSICSILA: Yes. Correct.

THE COURT: At that point, were there any restrictions put on its dissemination by the city? At that point as the stuff was being disseminated, in other words?

MS. CSICSILA: Yes, the officers were bound by

Title III, the same as any federal law enforcement officers.

THE COURT: When somebody's doing an investigation, it's relatively predictable that there's going to be prosecutions; and if there's prosecutions, it's relatively predictable that something's going to have to be produced. Was there any kind of formal restriction put on the production of this stuff in the criminal case at all?

MS. CSICSILA: There were. There were protective orders in place.

THE COURT: At the time that the stuff was produced, were there protective orders?

MS. CSICSILA: Not at the time of the investigation.

THE COURT: At the time the material was first produced to defense counsel in the criminal case, was there a protective order in place, as you understand it?

MS. CSICSILA: No.

THE COURT: Right.

Okay. So one got put on later.

So did the government do anything in any of that period of time to come in and say, hey, wait a second, this is a violation of Title III of the Omnibus Crime Control Act of 1968 and you guys are breaking federal law and it's a crime?

MS. CSICSILA: Your Honor, sorry. I want to make sure we're talking on the same page and I think I might have misunderstood. At the time of the federal investigation in

2012, the city officers were under the Title III restrictions.

THE COURT: In what way were they under them? Just because there's a law or was there something beyond just the fact that there's a law?

MS. CSICSILA: Because there's a law, they were instructed as part of the Title III process regarding the secrecy obligations and that sort of thing. At the time -- so that was in 2012.

THE COURT: Yeah.

MS. CSICSILA: Those materials were held by both CPD and the federal government, but pursuant to the federal criminal cases that came out of this investigation.

THE COURT: I'm asking about the state criminal case.

MS. CSICSILA: The states criminal cases, I don't know the exact time that those materials were produced to defense counsel, but it was much later than 2012.

THE COURT: Sure.

MS. CSICSILA: At the time that the materials were produced, at some point, we became aware of these issues and worked with the state's attorney's office to go through the Title III materials and pull them -- essentially provide them with anything that they thought was relevant and also not disseminate what was in the federal government's possession.

THE COURT: Okay. So we're getting away from the questions I was asking. So was material produced -- was

material that's subject to what -- to the Title III restrictions that you're talking about in the materials that you filed here now, was any of that material produced in the criminal case involving Mr. Villa, yes or no?

MS. CSICSILA: My understanding is yes based on defense counsel's representation.

THE COURT: That's a pretty -- that's an easy one. They're going to get harder.

So at the time it was produced by the Cook County State's Attorney's Office, who presumably got it from the Chicago Police Department or wherever, at the moment it was produced, to your knowledge, was there any restriction placed on it in the context of the criminal case in the state court? I'm being told the answer to that is no. Is that wrong or is that right?

MS. CSICSILA: I have no information one way or another because we were not involved in the state case.

THE COURT: At what point did the government become aware that material was being produced in the state court case -- in the state court case involving this plaintiff?

MS. CSICSILA: I believe it was when the -- when counsel for the government approached our office about --

THE COURT: Counsel you mean for the State of Illinois?

MS. CSICSILA: I believe it was the State of Illinois.

THE COURT: Okay.

MS. CSICSILA: -- (continuing) about going through the materials in our possession, the federal materials, and seeking materials in our possession that may be relevant to the Villa state case.

THE COURT: Maybe I have a basic misunderstanding here. I want one person on the plaintiff's side to tell me this. The material that we're talking about here -- I'm going to wait until you're looking at me.

MS. BLAGG: I'm asking my associate to text me a date.

THE COURT: The material that we're talking about here, the material that is ostensibly subject to the restrictions in Title III --

MS. BLAGG: Yes.

THE COURT: -- did you get any of that in the state court criminal prosecution?

MS. BLAGG: I did.

THE COURT: Did you get it because the state's attorney's office produced it to you or did you get it pursuant to a subpoena?

MS. BLAGG: I got it pursuant to a subpoena to the Chicago Police Department.

THE COURT: That was going to be my next question. The Chicago Police Department. At the time you served the subpoena to the Chicago Police Department and at the time you

got the materials that we're talking about here, was there any protective order in the state court case?

MS. BLAGG: No.

THE COURT: There was later, though, right?

MS. BLAGG: Yes.

THE COURT: Did it cover all of the discovery, not just this stuff? It was just a general protective order?

MS. BLAGG: It was retroactive to the --

THE COURT: Retroactive, but it recovered everything?

MS. BLAGG: That's right.

THE COURT: Okay. As I understand it, the protective order later got lifted by the state court judge?

MS. BLAGG: It was modified to allow production.

THE COURT: In this case?

MS. BLAGG: That's right.

THE COURT: And that was done by the state criminal court judge after the case was basically over.

MS. BLAGG: That's right.

THE COURT: Either that or the chief judge down there.

MS. BLAGG: Just to be clear, there were two, two protective orders, one in Clay and Colon, that got modified by a different judge. They were in front of different judges, so this one, yes.

THE COURT: You just told me something I didn't realize. There were two different cases, basically?

MS. BLAGG: That's right.

THE COURT: Got it.

MS. BLAGG: That's why it was confusing a bit because one case -- Clay and Colon were in front of Judge Reddick.

THE COURT: But they said roughly the same thing ish?

MS. BLAGG: Ish. They were a bit different. The Villa one was more restrictive, and it contained provisions --

THE COURT: Yes. But one way or another, it didn't exist at the time that you got the stuff pursuant to the subpoena that we're talking about right now?

MS. BLAGG: That's right.

THE COURT: Now I'm back to Ms. Csicsila. How does that happen? How does that happen? That's a pretty big question.

MS. CSICSILA: So the production -- my understanding is that because CPD had the materials in their possession related to our federal investigation and there was a state criminal case, the materials are produceable in the state case to the extent they are relevant under --

THE COURT: Which section of Title III is that?

MS. CSICSILA: It's Section 2517(1) and (2) allow law enforcement officers to use wire tap materials in the performance of their official duties.

THE COURT: That has been interpreted to mean producing stuff in a criminal case?

12

MS. CSICSILA: That's the provision that we pointed to, I believe.

THE COURT: That's not what it says. I mean, using it in your official duties is different from producing it in a criminal case because it just is.

MS. CSICSILA: Well, I believe that -- I believe that's the --

THE COURT: 2517 which?

MS. CSICSILA: 2517(1) and (2).

THE COURT: So what you're saying is that it was okay for the Chicago Police Department to produce this material without restrictions to the defendants, to the defendants in the criminal case because that's what happened. When they produced it, there was none.

MS. CSICSILA: Yes.

THE COURT: Was that okay or was that not okay? There's only one right answer to that question. I'm going to see if you get it.

MS. CSICSILA: Well, your Honor --

THE COURT: It's not okay, right? It's not okay.

MS. CSICSILA: It wasn't in connection -- you know what? To be honest, I don't know if it was okay or not.

THE COURT: There was no restriction put on the defendants disseminating it.

MS. CSICSILA: Well, that is a separate mechanism

which is -- that's a separate mechanism which is there should have been a protective order in place.  There wasn't.

THE COURT:  The answer to my question is it wasn't okay?

MS. CSICSILA:  Correct.

THE COURT:  For them to produce it without a protective order in place.

MS. CSICSILA:  Correct.  Correct.

THE COURT:  When did the government find out that that had happened?

MS. CSICSILA:  I don't know the exact date, but it was around I believe the time that I was communicating with Ms. Blagg and others related to subpoenas that they were issuing in connection with the Villa case when it was remanded for retrial.

THE COURT:  What Ms. Csicsila is talking about, is that before or after you had gotten the stuff from the CPD?

MS. BLAGG:  After.

THE COURT:  That's what I thought.  So did anybody, you or anybody else in the government, go back to the Chicago Police Department and say, hey, guys, you shouldn't have done what you did, you shouldn't have produced this stuff without a protective order?  Did anybody do anything like that?

MS. CSICSILA:  We had communications with CPD at the time about the materials.

THE COURT: Okay.

MS. CSICSILA: Yes.

THE COURT: This isn't George Stephanopoulos where you just give an evasive answer to the question and George goes on to the next question because he doesn't care. I care and I'm going to get an answer. So try it again.

MS. CSICSILA: Yes, we had communications with CPD regarding the materials.

THE COURT: I'm going to ask my question again, and I'm going to sit here until hell freezes over to get a direct answer to my question. I'm going to pull up the realtime transcript so I can read it back correctly.

All right. Did anybody, you or anybody else in the government, go back to the Chicago Police Department and say, hey, you shouldn't have done what you did, you shouldn't have produced this stuff without a protective order? Did anybody do anything like that?

MS. CSICSILA: I believe, yes.

THE COURT: Who?

MS. CSICSILA: It would have been me. It would have been me.

THE COURT: When you say "you believe," what's that?

MS. CSICSILA: Because I don't know if I specifically referenced the protective order or not. I don't recall if I was in the weeds at that level in the state proceedings. I do

know that we had conversations with the Chicago Police Department about their production of the Title III materials. It had been done --

THE COURT: Okay. So you've answered my question.

So time -- ballpark time, when was the protective order modified?

MS. BLAGG: The protective order I think was -- we had --

THE COURT: Modified to allow you to produce the stuff in this case, in other words?

MS. BLAGG: In this case?

THE COURT: Well, what was the modification that you talked about before?

MS. BLAGG: The modification was after Mr. Villa was granted a new trial and the state dropped charges, and it was approximately -- it was after October.

THE COURT: The modification modified it to say what?

MS. BLAGG: To allow production in the civil case.

THE COURT: Okay. When did that happen?

MS. BLAGG: It was after October of 2024. Like November, December, somewhere after he was --

THE COURT: When did you -- when did the government find out about that?

MS. CSICSILA: About the modification of the protective order? I can't say. I don't know.

THE COURT: Does that mean -- does that mean you never found out about it until somebody told you about it in their papers filed in this case?

MS. CSICSILA: It means I don't recall. I don't recall if I was told about it at the time.

THE COURT: You will understand why I think that is less than a satisfactory answer. Okay? Because if somebody knew about it at the time and said nothing, that's a meaningful inaction. If somebody knew about it at the time that the protective order was being modified to allow the production of materials received in the criminal case in civil cases and the government was aware that this Title III material was in there and said nothing about that, that is a meaningful omission. If you don't recall, that's essentially -- I take that as a concession that you were aware of it at the time -- that the government was aware of it at the time and did nothing.

Okay. Do you want to try a little harder to remember?

MS. CSICSILA: Judge, I'm not going to be able to remember standing here.

THE COURT: The point that's been raised in this case has been forfeited about 15 times over. Actually, that's an exaggeration. Twice. Twice. The second time was the most meaningful and that was not by not interposing any kind of an objection when the modification was made to the protective order in the civil case. That's outside -- assuming that you

are reading 2517(1) and (2) correctly, which I don't necessarily agree with, but I'll take it for now, use of it in a civil case by a defendant who has received it in a criminal case is outside of that.  So it's been forfeited.  That's the first problem.

The second problem is -- and I'm going to ask you this question anyway because -- just because I am.  So the material that you cite or the statute you cite basically says it can be produced in connection with the trial, right?

MS. CSICSILA:  Yes.

THE COURT:  So how is that supposed to work in a civil case?  You tell me.

MS. CSICSILA:  Judge, I'm trying to explain a very inartfully drafted statute.  What the government has done in the past is produce the materials relatively close to an officer or law enforcement officer, their testimony, so that there's an opportunity for them to prepare and be refreshed and all that, but not so far in advance that it's --

THE COURT:  Does the other side get it then too?

MS. CSICSILA:  -- counterproductive.

Yeah, I believe so, your Honor.

THE COURT:  In other words, it would be produced to both sides at this point in time close to trial?

MS. CSICSILA:  Yes.

THE COURT:  Close enough, but not too close.  It's

kind of like Goldielocks. I'm just saying.

MS. CSICSILA: Yes.

THE COURT: Okay. It's really not workable. I will tell you that I had an experience with this which I think has been cited in here in a case like this called *Fields* where it happened way before the trial. I'm about as certain as I can be. Mr. Loevy can tell me if I'm wrong. I'm pretty sure that the Title III material got produced significantly in advance of the trial. Am I wrong?

MR. LOEVY: Long before I got involved in the case.

THE COURT: And you were in between the second and the third trial, yeah. It's not -- the Seventh Circuit has kind of said this in a case somebody cites. *Brand Name Prescription Drugs* I think is the title of the case. It's not a workable solution. The cat is so far out of the bag, the cat is in the next country at this point.

MS. CSICSILA: I understand, your Honor.

THE COURT: So the motion is entitled -- hang on a second; I just want to make sure I get it right here -- Permission to Disclose Documents. It's granted for the reasons stated in court. It's going to be subject to the protective order in this case. You'll figure out, you know, how you got to stamp crap and stuff like that.

Ms. Csicsila, you can take off if you want to. You don't have to hang around.

MS. CSICSILA: Thank you, your Honor.

THE COURT: So the second thing then is -- give me a minute here. I guess I regard these as sort of related, but not necessarily. It's the motion by the city. It has kind of a long title, but it's a motion for protective order.

Okay. So I want to make sure that -- I'm not completely understanding what the universe of materials is that this covered. Can you kind of hit me between the eyes with it.

MS. DOI: Of course, your Honor. So the documents at issue are these emails and attachments that were originally produced to Ms. Blagg via a number of subpoenas that she issued. I think the email-only subpoenas probably are in the 20 to 25 range. So there were responses to these subpoenas directly from CPD that they pulled from their tech department and sent directly to Ms. Blagg without meaningful review.

THE COURT: When you say "directly," without going through you guys?

MS. DOI: Correct. We're not clear on this yet, and I'm going to have to check with the production counsel for the CCSAO, but I believe they may have been produced in the same disc form to the CCSAO. I don't know if Ms. Blagg knows that or not.

THE COURT: That's the attorneys who are not here, right?

MS. DOI: Well, the production counsel, Mr. Kirk and

Mr. Oberts, right. They weren't required to be here.

THE COURT: Different lawyers?

MS. DOI: Right. Right. So what we are -- our firm was operating under was the assumption that in the Relativity project itself, which the Relativity project culled all these emails together, the city did get involved at some point on a motion for sanctions that Colon's lawyers filed in criminal court. That's when the city came in which is in approximately November of 2022. It was Christine Hake, who was the deputy corporation counsel of LIP, the legal information section. So at that point --

THE COURT: Why is the legal information section called LIP? What's the P?

MS. DOI: Prosecutions.

THE COURT: Okay.

MS. DOI: It's an odd acronym. So she got involved. And she discovered that CPD had done this and it clearly was not ideal and had many conversations with both sets of counsel, including Mr. Colon's I think public defender at the time, that she wanted to maintain some confidentiality here over these documents and that there were privileged documents in there certainly. So that was as of November of 2022. So I think there was a general understanding among the criminal --

THE COURT: Can I ask --

MS. DOI: Okay. I'm going on a tangent. I'm sorry.

THE COURT: No, keep going. I'll come back and ask my question. I'll just make a note.

Go ahead. Keep going.

MS. DOI: There was a general understanding and agreement among all of the counsel for each of the criminal defendants, Villa, Clay, Colon, that a protective order needed to be put into place, and it was an agreed protective order, and it was retroactive on anything that had been produced previously, particularly in the Villa case to Ms. Blagg. A lot of these emails that we're talking about, your Honor, are completely not relevant to this case. They were caught up in these mass term email searches.

THE COURT: Yep.

MS. DOI: And I didn't want to interrupt Ms. Csicsila, but one of those subpoenas was specifically for Operation Snake Doctor, which necessarily --

THE COURT: That's the federal thing?

MS. DOI: Correct.

-- (continuing) which necessarily imputed a number of emails across the system from the officers that worked on that, many of whom are defendant officers in the Villa case now.

THE COURT: Okay.

MS. DOI: So that is how the Title III got involved. So I believe that Ms. Hake discovered that. She had contact with Ms. Csicsila pretty soon after she discovered that. I

think it was still within 2022. Ms. Hake was put under a very severe time line by Judge Reddick to gather all that she could about Snake Doctor and all the other subpoenas that had already been percolating out there and so Ms. Hake did that and did a review, and she produced approximately just under 12,000 pages of documents, totalling about 556 documents in total. The pages were about 12,000. So it was really a needle in a haystack type of stuff. And, you know, she spent quite a bit of time and effort -- and I know that Ms. Blagg has as well certainly -- in going through this multitude of emails to narrow down to what's particularly relevant to the claims in this case and the claims the plaintiffs are making. So I do think that we are on the same page with the plaintiffs.

THE COURT: So basically what we're talking about here is, for want of a better word, clawbacks, right?

MS. DOI: Correct.

THE COURT: If I'm understanding it right, it's two categories of things that you're proposing to be able to claw back. One would be the material that you say is, quote/unquote, not relevant because it doesn't directly involve the underlying claims in this case. Right so far? And the other category is the privilege stuff?

MS. DOI: Correct. The privilege stuff is what we really want to technically claw back, pull out of their possession, and that was about 3500 to 4500 documents. I don't

have an accurate number.

THE COURT: Is that a page count or is that a document count?

MS. DOI: It was is a document count.

THE COURT: It may be more pages than that.

MS. DOI: Correct.

THE COURT: But a lot of it will probably be duplicates because you're talking emails --

MS. DOI: It's mostly like one- to two-page emails.

THE COURT: My question that I was going to ask is privileged how? What's the privilege? What are we talking about?

MS. DOI: So I set certain things aside, and it was really just me and my associate doing this privilege review. We noticed that there were documents produced that clearly we don't -- they never should have been released in the public realm, such as full alpha lists of officers with all of their identifying information, home addresses, SSNs, things like that that were associated with a technology update to the email database or some database internally that got caught up because the search terms searching for Louis and names and things.

THE COURT: So confidential information regarding personal identifying information regarding officers, that's category one. What else?

MS. DOI: There's HIPAA information in there. There

are medical records associated with OSHA.

THE COURT:  What type?

MS. DOI:  Worker comp injuries.

THE COURT:  So also officers?

MS. DOI:  Correct.

THE COURT:  In other words, stuff out of personnel files essentially?

MS. DOI:  Correct.  Yes.

THE COURT:  HIPAA, medical stuff.  What else?

MS. DOI:  Attorney-client communications.

THE COURT:  This is what I want to zero in on.

MS. DOI:  Yes.

THE COURT:  What attorney, what client?

MS. DOI:  So we ran a search for any and all names associated with attorneys and CPD legal -- well, CPD legal attorneys and CPD legal personnel.  So we pulled and set aside all emails to and from those individuals, including all attachments.

THE COURT:  Okay.

MS. DOI:  And, you know --

THE COURT:  The privilege is privilege running between police personnel and CPD legal counsel, basically?

MS. DOI:  Correct.  Correct.  And just --

THE COURT:  I wondered if there was anything with your office.  I'm guessing no, because you weren't involved in the

initial.

MS. DOI: There were a few corporation counsel emails in there that we did set aside. As human beings, we're not perfect, so that's why out of an abundance of caution, we labeled the native files we did turn over as confidential just in case something slipped through.

THE COURT: Confidential -- PII on officers; HIPAA medical, second category; third category is attorney-client privilege. Any other categories?

MS. DOI: I think there was at least one other one. There are cases that were like FBI joint cases involving sex trafficking.

THE COURT: Maybe victims.

MS. DOI: Yeah, some very private, confidentially marked things or at least very law enforcement sensitive.

THE COURT: At this point, and I know there's a large volume of stuff, has somebody gone through all of it and have you identified all of the material that you think legitimately ought not to be produced?

MS. DOI: Well --

THE COURT: Not counting the relevant stuff. I'm talking about the confidential stuff that we're talking about right now.

MS. DOI: I mean -- well, we're in the process of narrowing it the opposite way, your Honor, which is we're

narrowing in on the communications among the different defendant officers which we think are going to be relevant in the case. We're running search terms for the ASA defendants.

THE COURT: I should have asked this a different way. What does it entail? If I was going -- if I were to say, okay, you can claw back all of the confidential/privilege stuff, what would you have to do in order to do that?

MS. DOI: We've already put aside a certain portion of it in the privilege log that we had distributed to counsel.

THE COURT: What would you have to do to finish the job?

MS. DOI: We would have to write a letter to plaintiff's counsel and ask them to return everything on that list.

THE COURT: So there's a finite list that exists right now of the stuff that you want back?

MS. DOI: There is.

THE COURT: Okay. Pause right there. Actually, one more question. And the finite list of the stuff that you want back all falls within the categories that you were just talking about, PII, HIPAA, medical, privilege, and victim information from other cases.

MS. DOI: Correct. There may be one other category that's sensitive, correct.

THE COURT: All right. Actually, I should ask one

other question.  And that's the 3500 or so pages?

MS. DOI:  Yes.

THE COURT:  Or documents rather?

MS. DOI:  Yeah, and that list was mistakenly initially attached to plaintiff's Exhibit No. 5.

THE COURT:  So you had to --

MS. DOI:  We were like, you need to take that down, so they did.

THE COURT:  All right.  Okay.  So I'm not talking about the arguments about relevance at this point.  I'm just talking about the stuff that Ms. Doi has been talking about here.  I get that there's an argument that whatever privilege that might have existed has been waived because this was produced without restriction.  I get that.  Let's just put that to the side.  I'm talking about the need for it in this case.  So talk to me about that.  What of this stuff do you think you need and why?

MR. LOEVY:  Big picture, we seem to be arguing about something when we're really talking about something else.  We came here trying to get leave to disclose the relevant documents.  They've identified a small subset.  I think your Honor's correctly focused on it.  That's the problem.  That solved that problem.

The confidential stuff is easy.  There's a protective order.  You redact.  It's confidential.  If there's concerns,

that's not a problem that doesn't happen every day. You know, we have a protective order that says Social Security numbers are redacted. We would cooperate in redacting them or just treat them as protected under the protective order.

There's some unidentified subset where they are asserting a privilege. Maybe it's a deliberative process privilege, maybe it's attorney-client. There's a mechanism for adjudicating that too. Probably they should file a motion to claw it back. We would get the exact arguments. You know, how can we decide -- we don't know if the 3500, some small subset might be attorney-client; maybe they're six documents. We don't know what they are. How can you decide until we even know what we are talking about. That is a separate problem, what do we do about this potentially very small subset of attorney-client. That's got nothing to do with what we came here to argue about today which is we'd like to give them the thumb drive with our documents. I guess I shouldn't --

THE COURT: Them being the opposing counsel in the case?

MR. LOEVY: Yes, separate issues.

THE COURT: And the thumb drive has the material on it that Ms. Doi has been talking about?

MR. LOEVY: Yes.

MS. DOI: Well, I don't know if they can verify that. That, I guess, is the question here. So in the response, they

cited that they have over -- I think they said they had 200,000 documents they wanted to reproduce to us. We produced over 287,000 documents. So naturally, you would think the documents they want to reproduce back to us are subsumed within that.

Then there was a mention in the response about originally there were half a million documents that were tendered to Ms. Blagg, and that's something -- I'm trying to check with the police department because they did not preserve copies of what they sent -- of the actual CDs they sent to Ms. Blagg and she's having trouble locating them. So we are trying to work with the police department's tech division to recreate what was actually given to her. My understanding is that those 287,000-plus documents that our firm has been reviewing was the sum total of all the subpoenas that CPD fulfilled prior to Ms. Hake entering the case.

There's such a discrepancy in that 5 million number -- I'm sorry -- half a million number, 500,000, to the 287 that we have. There's a couple reasons why that could be.

One is that those 500,000 emails aren't necessarily all from CPD that were transmitted to the Loevys because I know that the CCSAO also did emails as well.

Two, it's 500,000 documents. And how my vendor has explained it to me is that an imbedded image inside a document could count as a document. It's apples and oranges between the two systems.

30

THE COURT: Honestly, you're telling me way more than I actually want to know at this point.

MS. DOI: I know. It's mind numbing.

THE COURT: Putting aside this stuff that you contend is not relevant, just the stuff that we've been talking about here, what I'll call the confidentiality/privilege stuff, you've identified what those documents are to the plaintiffs, right?

MS. DOI: Yes. And we provided --

THE COURT: How hard would it be for you to produce everything but that stuff?

MR. LOEVY: May we confer for a moment, your Honor?

THE COURT: Yeah.

MR. LOEVY: We think that that is a manageable task. If they identify the documents, Relativity, the database, could find those documents.

THE COURT: Find the documents. So here's the way I think this would work. I'm not going to -- I'm not going to preclude production of the other category of stuff that we haven't talked about which is the documents that the city contends isn't relevant. You guys know this better than I do. There was no such thing as e-discovery when I was practicing law. There just wasn't. But I've learned enough about it. Overproduction of stuff is kind of a function of e-discovery. It's not a bug; it's a feature.

31

MS. DOI:  Correct.

THE COURT:  So we're not -- the process to go through and cull that stuff out would be overwhelmingly time consuming. It's not worth it.  There's a protective order, and it's going to cover all of that stuff.  I'm putting that to the side.  I'm not going to have them withhold that.

On the rest of it, I think there's a legitimate interest in not having people -- in particular, police officers' -- personal identifying information out there even if there is a protective order, okay?  Even if there is a protective order, I'm not saying how much of this there is, but it's just the more people stuff gets turned over to, the more likely it is that somebody's going to make a mistake.  That's the second thing.

The same is true for medical information about somebody.  The more people it gets turned over to, the more likely it is that somebody's going to inadvertently or advertently turn it over.  Let's talk about inadvertent at this point.

I think before that stuff gets generally disseminated, there ought to be a process of going through and just taking that small -- that smaller sub universe of documents and redacting out the PII, redacting out the medical stuff, or maybe that's going to be entire pages or entire documents in some things, as well as the privileged stuff, and then we have

a series of smaller sub universes or solar systems, if you will, of things that I can adjudicate. But I don't want to hold up everything to do that because that seems crazy. There's enough documents in the case already that it doesn't make sense to do that.

What I'd like you to do is I'd like you to confer. You basically means you and you, you, and you folks. Confer and, you know, make sure that you can hold out the documents that have been identified in this subset, produce everything else, hold these things out, come up with a process -- and I'm not talking about a leisurely process; I'm talking about a relatively expeditious process -- for telling them what needs to be culled out, what needs to be redacted out. You talk about it. If there's something for me to decide -- you may decide, we're good with redacting all that stuff out, and then I'll decide what's left, and then we go on from there.

MS. DOI: Your Honor, may I? Just a couple points of clarification.

THE COURT: Of course.

MS. DOI: Just the reason why we filed this motion -- we, unfortunately, were forced to file this motion because of a conversation I had with Mr. Loevy's colleague who took a very firm line about -- he was going to basically dump all of those 200,000 emails that they claim they have on to all the parties with no protections, no confidential markings, no redactions,

nothing.  And so it forced my hand to have to file this motion.

THE COURT:  If where we're going is all this stuff for now is to be produced to the confidentiality orders, the protective order.  Is that where we're going?

MS. DOI:  Yes.  There's some designation on the files that they're going to produce that indicates that it is under a protective order because, as you know, you can't unring the document if you produce a document with --

MR. LOEVY:  Are we talking about the whole universe or the subset they've identified?

THE COURT:  The whole universe for now.

MR. LOEVY:  The whole universe for now, got it.

MS. DOI:  Thank you, your Honor.

THE COURT:  We'll figure it out later.  That's what people do.

MS. DOI:  We don't want to hold up discovery.  That's why we rushed to get it out and put it in everyone's hands.

THE COURT:  I know that I've got the motion to dismiss by about a dozen or so individual defendants.  I'm going to deal with that in a second.

Have I dealt with everything else?  Does anybody need any more points of clarification or anything else?

MS. DOI:  I don't think so.

THE COURT:  The order on the motion for protective order, which is called -- I'll just call it Motion For

34

Protective Order -- Melissa, it's docket number 135 -- will say it's granted to the extent stated in open court. Order the transcript. It gets too complicated otherwise.

MS. DOI: Thank you, your Honor.

THE COURT: The last thing is the motion by certain individual defendants to dismiss. I said a dozen. It's maybe more than a dozen. I'm not going to name them here.

Basically, it's not all the individual defendants. It's roughly half of them. They've made a motion to dismiss saying that they're just lumped in it with everybody else. That's true. They are -- there are essentially group or blanket allegations in the case that all of the officers fabricated evidence, didn't turn over exculpatory evidence, or otherwise violated the plaintiff's constitutional rights and blanket allegations that other -- the entire group of officers failed to intervene and so on.

On some of the officers, there are more specific allegations. Of the I think it's 17 or 18 that have made the motion to dismiss, there's really only a couple of them where there's any specific mention of them in the complaint. On most of those, it's simply a general allegation that they supervised other officers. On one of them, it's something that he's been sued in the past for misconduct, and that doesn't really relate to this case. It may relate to something -- there's no specific allegation. The problem is there's really not

anything wrong with that. It's could a complaint be written that had specific allegations saying what each defendant is claimed to have done? Of course it could, but that's not the standard.

I don't think there's a basis to dismiss the claims here. The backstop, if you will, is Rule 11, because if somebody just kind of sues everybody in the universe and it turns out they didn't have a basis for it to begin with, then I'll hear about it later and I'll deal with it. So the motion to dismiss is denied. You've got 21 days to answer on behalf of those defendants.

Melissa, that motion -- I don't remember what number that is. You'll find it.

Okay. Do we have another status set in the case or was this the last?

MS. DOI: It's August 23rd, your Honor.

THE COURT: We don't need to do it that quick.

MS. DOI: May I ask one question?

THE COURT: If you think we do, tell me.

MS. DOI: I don't. This is just one other point of clarification on the documents. Now that you have ruled that the Title III documents can be released --

THE COURT: Yeah.

MS. DOI: -- I think the government -- in the past in the criminal cases, those documents were marked as

confidential.

THE COURT: They should be.

MS. DOI: Okay.

THE COURT: Again, I want to facilitate getting the stuff in everybody's hands, and we can fight later about whether that's an appropriate designation.

MS. DOI: Thank you, your Honor.

THE COURT: You said the 23rd is the date we have now?

MR. LYDON: Your Honor, I think it's the 29th.

THE COURT: The 23rd would be a Saturday. I'm just telling you I'm not going to be here. The 29th. We can move that back a bit. Why don't we say -- why don't I say the 17th of October at 9:30. And whatever the date is for the status report currently, it's moved to the 10th of October, which is a week before.

Okay. Thanks for coming in.

MR. LYDON: Thank you, Judge.

MR. LOEVY: Thank you, Judge.

(Adjourned at 10:24 a.m.)

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/ *Carolyn R. Cox*                    August 6, 2025
Carolyn R. Cox, RPR, F/CRR
Official Court Reporter