# EXHIBIT 2

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF COOK     )

        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE        )
STATE OF ILLINOIS,   )
                     )
     Plaintiff,      )
                     )
     vs.             ) Case No. 14 CR 00328
                     )
ALEXANDER VILLA,     )
                     )
     Defendant.      )

        REPORT OF PROCEEDINGS had in the

above-entitled cause, before the HONORABLE

JAMES B. LINN, Judge of said Court, on the 26th day

of February, 2019.


        APPEARANCES:

        HON. KIMBERLY M. FOXX,
        State's Attorney of Cook County,
        BY:  MR. ANDY VARGA,
             MS. NINA RICCI,
             MS. NANCY ADDUCI,
             MR. NICHOLAS FLORES,
             Assistant State's Attorneys,
             appeared on behalf of the People;

        MR. MICHAEL CLANCY,
        MR. MATTHEW MCQUAID,
             appeared on behalf of Alexander Villa.

Sharon E. Thompson, CSR 084-004429
Official Court Reporter
2650 S. California, Room 4-C02
Chicago, Illinois 60608

RR-1

VILLA_AV_002796

INDEX

People vs. Alexander Villa
DATE: 2-26-19

EXAMINATION OF EDGARDO COLON                                    PAGE

    BY THE COURT.................................7

EXAMINATION OF DESTINY RODRIGUEZ

    DIRECT BY MR. VARGA.........................15
    CROSS BY MR. CLANCY.........................45

EXAMINATION OF RICHIE DRIVER

    DIRECT BY MR. FLORES........................63

EXAMINATION OF CYNTHIA CELESTINE

    DIRECT BY MR. FLORES........................84
    CROSS BY MR. CLANCY.........................92

EXAMINATION OF OFF. BRIAN SMITH

    DIRECT BY MR. FLORES.......................104

Reporter's Certificate -  P. 104

VILLA_AV_002797

DESTINY RODRIGUEZ, called as a witness, having been first duly sworn, was examined and testifies as follows:

DIRECT EXAMINATION

BY MR. VARGA:

Q. Ms. Rodriguez, would you introduce yourself to the ladies and gentlemen of the jury and spell your last name for the benefit of the court reporter?

A. Sure. Good afternoon. My name is Destiny Rodriguez. My last name is R-O-D-R-I-G-U-E-Z.

Q. And if you can please try to keep your voice up and --

A. Sorry.

Q. -- maybe get this microphone a little bit closer.

A. Okay.

Q. Thank you.

A. Is that better?

Q. Yes. Ms. Rodriguez, how old are you?

A. I am now 29.

Q. And do you work?

A. Yes, I do.

Q. What kind of work do you do?

A. I am a licensed insurance broker.

RR-15

VILLA_AV_002810

Q.   How long have you been engaged in that line of work?

A.   About seven months now I have been licensed.

Q.   And do you work as a licensed insurance broker somewhere, for a company in the Chicago area?

A.   Yes, I do.

Q.   You, in fact, live in the Chicago area?

A.   Yes, I do.

Q.   Prior to the time that you started working in the insurance business, what kind of work did you do?

A.   I was a hair stylist.

Q.   How long did you do that?

A.   Since I was about 12 or 13 years old.

Q.   Ms. Rodriguez, let me direct your attention back to 2011.  Were you involved in a relationship with a person named Renee Vazquez?

A.   Yes.

Q.   Yes?

A.   Yes.

Q.   When did you become involved in a relationship with Mr. Vazquez?

A.   I believe it was August of 2011.

Q.   And was this a dating relationship?

RR-16

VILLA_AV_002811

A. Yes.

Q. How old were you at that point?

A. I was 22.

Q. How old was Mr. Vazquez?

A. I believe he was 39.

Q. Now, when you began -- or after -- During the course of this relationship with Mr. Vazquez, did you learn whether or not he was a member of any kind of street gang?

A. Yes, I did.

Q. What gang did you learn him to be a member of?

A. The Spanish Cobras.

Q. Through your relationship with Mr. Vazquez, did you meet or in any way periodically associate with other members of the Spanish Cobras?

A. Yes, I did.

Q. Did those people -- Did that include a person who was referred to you or that was known to you at that time by the name or nickname of Flip?

A. Yes.

Q. Could you take a look around and let us know if you see Flip, the person that you referred to as Flip, in the courtroom today? If so, can you tell us

RR-17

VILLA_AV_002812

where he is seated and what he is wearing?

A. Right here, seated.

Q. You are pointing to the table to your right?

A. I am.

Q. What is Flip wearing today?

A. He has on a black outfit, glasses.

THE COURT: Indicating the defendant, Alexander Villa before the Court.

MR. VARGA: Thank you, Your Honor.

BY MR. VARGA:

Q. Ms. Rodriguez, during the course of your relationship with Mr. Vazquez starting in August of 2011, did you see the person you've identified, the defendant, on kind of a frequent basis?

A. He was always around.

THE COURT: Talk a little louder please.

THE WITNESS: He was usually around, so here and there.

BY MR. VARGA:

Q. Was he -- What did you -- What was your impression of the relationship that Renee Vazquez had with the defendant?

MR. CLANCY: Objection.

THE COURT: She can talk about her own state of

VILLA_AV_002813

mind, her impression, and her state of mind.

BY MR. VARGA:

Q.    Can you characterize the relationship?

THE COURT:  Her state of mind, her own impression.

THE WITNESS:  Under my impression Renee Vazquez was sort of what you consider a father figure to him and some of the younger gang members.

BY MR. VARGA:

Q.    So not just to the defendant, but the younger guys in the gang?

A.    Yeah.  Right.

Q.    Let me direct your attention to December 29 of 2011.  Were you with Renee -- Were you still seeing Renee Vazquez?

A.    Yes.

Q.    Were you with him that day?

A.    Yes, I was.

Q.    Where were you that day?  What were you doing?

A.    We were in the Humboldt Park neighborhood at his mother's house.  We were helping her clean since she's a little elderly.  And I would go over there with him from time to time and help her clean, and

VILLA_AV_002814

that just so happened to be one of those days.

Q. During -- Did there come a point during the evening hours when you left Renee Vazquez's mother's house?

A. Yes.

Q. Where were you going?

A. We were going back to my house.

Q. And where were you living at the time?

A. Melrose Park.

Q. Why were you and Renee Vazquez -- What were your planning for the rest of the evening?

A. We were going back to my house to shower and get ready. And we had plans to go out dancing later on in the evening.

Q. As you were on your way, and when you were traveling from Renee Vazquez's mother's house to your home, how were you getting there?

A. Renee Vazquez was driving.

Q. Okay. While Renee Vazquez was driving, was anybody else present but the two of you?

A. No.

Q. While you were in the car driving to your house or while Renee was driving to your house, did he receive a phone call?

RR-20

VILLA_AV_002815

A.    He did.

Q.    Did Renee answer that phone call?

A.    Yes, he did.

Q.    Could you hear what Renee was saying to the person during the course of the -- on the other side of the line?

A.    Yes, I could.

Q.    Could you hear what the other person was saying to Renee?

A.    No, I could not.

Q.    Can you characterize Renee's -- How did Renee sound when he got the call?

A.    He sounded concerned.

MR. CLANCY:  Objection, Judge.  Those are conclusions.

THE COURT:  No.  It's her state of mind.  Go ahead.  Sustained.

THE WITNESS:  Sure.  He sounded worried.  He sounded frantic, concerned.

BY MR. VARGA:

Q.    What did Renee -- Could you hear what Renee was saying?

A.    Sure.  He was asking --

MR. CLANCY:  Objection, Judge.  That's hearsay.

RR-21

VILLA_AV_002816

MR. VARGA: It would be an excited utterance, Your Honor.

THE COURT: Sidebar please. Sidebar please.

(Sidebar had off the record.)

THE COURT: Objection sustained. Ask another question.

BY MR. VARGA:

Q. Ms. Vazquez, this conversation you overheard Renee having, what time of day was this? Was this during the evening hours?

A. Yes.

Q. Do you remember a specific time?

A. I don't.

Q. After this phone call, did Renee Vazquez -- without getting into what he said, did Renee Vazquez continue to drive straight to his house?

A. No.

Q. Or rather straight to your house?

A. No.

Q. Where did Renee Vazquez drive after receiving this phone call?

A. He was circling the Humboldt Park neighborhood.

Q. While -- How long did Mr. Vazquez circle the

RR-22

VILLA_AV_002817

Humboldt Park neighborhood?

A. About 10 to 15 minutes.

Q. And at the end of this 10 to 15 minutes, did Mr. Vazquez receive another phone call?

A. He did.

Q. After receiving that phone call, again without getting into what Mr. Vazquez -- you heard Mr. Vazquez say, without getting into that, after receiving this second phone call, what did Mr. Vazquez do?

A. He just stated that --

MR. CLANCY: Objection.

BY MR. VARGA:

Q. Without getting into what he said.

A. Sure.

Q. Did he continue -- Did you then drive to your house?

A. Yes.

Q. All right. Upon arriving at your house, did you and Mr. Vazquez get ready to go out as planned?

A. We did.

Q. And did you eventually leave your house with Mr. Vazquez?

A. Yes.

RR-23

VILLA_AV_002818

Q.   Where did the two of you go?

A.   Him and I, we -- I can't recall exactly where the name of the place is.  We did go and have a drink, and then after that, it was maybe about 2:00 a.m., 1:30 to 2:00 a.m., we decided to head over to an after-hours -- an after-hours bar that had opened.

Q.   What was the name of that after-hours bar?

A.   Illusions.

Q.   Where was -- or where is Illusions located?

A.   From my recollection it was located on the kitty-corner of Division and, I believe, Thomas. Somewhere in the Humboldt Park neighborhood there on a little street.

Q.   Had you been to Illusions before with Mr. Vazquez?

A.   Yes.

Q.   What time did Illusions generally open?

A.   About 2:00 a.m.

Q.   And based upon your experience with Mr. Vazquez at Illusions, can you tell us who the typical clientele was?

A.   I mean the only people that were allowed to walk in there were Spanish Cobras.

RR-24

VILLA_AV_002819

Q. Okay. You said you got there with Mr. Vazquez at 2:00 a.m.?

A. Yes.

Q. When it opened?

A. Yes.

Q. Did you enter the bar with Mr. Vazquez?

A. I did.

Q. Can you describe it to us a little bit, the interior?

A. Sure. It's very small, long, open space. When you do walk in, directly to your right there were tables and chairs for seating, and then on the left side there there's a long L-shaped bar.

Q. When you and Mr. Vazquez entered the restaurant or the bar, where did you two go?

A. Immediately go to the back of the bar towards the back end of the L-shaped, so the end of the L-shaped bar in the back.

Q. And you were with Mr. Vazquez at that time?

A. Yes.

Q. Did you have a drink?

A. No.

Q. You had had a drink earlier that evening?

A. Just like a small drink, like a beer or two.

RR-25

VILLA_AV_002820

Q.    Okay.

A.    He was more of a drinker, not me.

Q.    All right.  Had you ingested any kind of illegal drugs?

A.    No.

Q.    Would you characterize yourself as -- at all intoxicated?

A.    No.

Q.    While you and Mr. Vazquez were in the bar, did you see at some point in time the defendant enter the bar?

A.    Yes.

Q.    Can you give us an approximate time the defendant entered?

A.    I would say maybe about 2:30, 2:45 a.m.

Q.    When the defendant entered, could you tell if he entered alone or if he was with other people?

A.    It was about the time everybody piles in there, so I couldn't say whether he was alone or who he came with.

Q.    Were you still with Mr. Vazquez over in that area by the L-shaped bar?

A.    Yes.  He wouldn't let me leave his side.

Q.    When Mr. -- When the defendant entered the

RR-26

VILLA_AV_002821

bar, did you or Mr. Vazquez do anything?

A. Well, I sat there and Mr. Vazquez motioned for him to come over to him so they could talk.

Q. Okay. Motioned for who to come over?

A. For the defendant.

Q. And when you say Mr. Vazquez motioned, can you demonstrate for the jury how it was that he motioned for the defendant to come over?

A. Sure. Just waved him over.

Q. All right. Now, did the defendant then -- And indicating with your right hand kind of in a waving motion towards you?

A. Yes.

Q. After Mr. Vazquez made that motion, what did the defendant do?

A. He walked over to him.

Q. Now, where were you when the defendant walked over to Mr. Vazquez?

A. I was seated directly next to him.

Q. Next to who?

A. To Vazquez.

Q. Okay. How close were you seated to where Mr. Vazquez was?

A. About 2 inches a way.

RR-27

VILLA_AV_002822

Q.   So you could easily reach out and touch him?

A.   Easily, yeah.

Q.   Could you -- When the defendant walked over, where was the defendant?

A.   He was standing right behind me.

Q.   So behind you?

A.   Uh-huh.

Q.   Could you see him?

A.   No.  Well, I didn't -- I could see him, but I wasn't facing them while they were speaking.  That conversation wasn't mine to be had.

Q.   There were other people in the area?

A.   Yes.

Q.   Did the defendant and Mr. Vazquez then have a conversation?

A.   Yes.

Q.   In your presence?

A.   Yes.

Q.   Were there other people standing around?

A.   Yes, sir.

Q.   From what you could tell, did any of the other people standing around, were they participants in this conversation between the defendant and Mr. Vazquez?

RR-28

VILLA_AV_002823

A.    Not that I can see.

Q.    Could you hear the defendant and Mr. Vazquez speaking?

A.    Yes.

Q.    So whatever the noise of the bar, the music, whatever, did that impair your ability to hear the conversation?

A.    No.  They were within inches of my ear.

Q.    I am sorry?

A.    They were within inches of my ear.

Q.    What did Mr. Vazquez say to the defendant and what did the defendant say to Mr. Vazquez?

MR. CLANCY:  Objection to what Vazquez said to the defendant as hearsay.

THE COURT:  Overruled.  I find that preliminary to what the defendant may have said.  Overruled.  Go ahead.

THE WITNESS:  Okay.  So from my recollection, Renee Vazquez asked him what happened and --

BY MR. VARGA:

Q.    Renee Vazquez asked who what happened?

A.    Asked the defendant here what happened and --

Q.    What did the defendant say, if anything, in

RR-29

VILLA_AV_002824

response to him?

A. Sure. And what the defendant did say, from my recollection, is that he had shot a cop.

Q. Did he say anything else?

A. No. Well, he proceeded to say, If I had known he wasn't a pig, I wouldn't have shot him. Renee asked him a couple more things, as far as what did they do with the gun.

Q. Did the defendant respond to that?

A. He did. He said that they had gotten rid of it already. From my recollection, that is how that conversation went.

Q. Did you participate in this conversation at all?

A. No. No. It wasn't mine to have.

Q. So the defendant, Mr. Vazquez, was literally within inches of you when they had this conversation?

A. Yes.

Q. While they were having this conversation, at any point in this conversation did you see the defendant's face?

A. I did. I turned around when I heard him say he had shot a cop because I was appalled.

Q. Can you characterize the defendant, the

RR-30

VILLA_AV_002825

expression on his face?

A. Sure. When explaining this, there was a smile and a smirk. He was more than happy.

MR. CLANCY: Objection.

THE COURT: Overruled. This is her present sense impression.

MR. CLANCY: Judge --

THE COURT: Overruled.

THE WITNESS: That was it.

BY MR. VARGA:

Q. In addition to what he said and in addition to the smile and the smirk, Mr. -- did the defendant make any other kind of noise?

A. Not that I can recollect.

Q. Ms. Vazquez, let me direct your attention to July 11th, 2013.

A. Ms. Rodriguez.

Q. I am sorry. What did I say?

A. Ms. Rodriguez. You called me Vazquez.

Q. I do apologize.

A. Uh-huh.

Q. Ms. Rodriguez, July 11, 2013, did you give -- meet with a Detective Tony Noradin and an Assistant State's Attorney named Natosha

RR-31

VILLA_AV_002826

Cuyler-Sherman at the Franklin Park Police Department? And I am showing you what I have marked as People's Exhibit No. 23 for identification.

A. Yes.

MR. CLANCY: Judge, I am going to object. It's a prior inconsistent.

THE COURT: I want a sidebar please.

(Sidebar held off the record.)

THE COURT: You may continue on, Mr. Varga.

MR. VARGA: Thank you.

BY MR. VARGA:

Q. Ms. Rodriguez, let me ask you this instead: You indicated that when the defendant was talking to Mr. Vazquez about shooting a police officer, that you said he was smiling and smirking, I believe?

A. Yes, I did.

Q. Was he also laughing?

A. Yes. He had laughter in his voice. He was more than pleased with himself.

Q. Let me direct your attention now to, I guess it would be later that same -- and this would have been then during the very early hours of December 30th --

A. Yes.

RR-32

VILLA_AV_002827

Q. -- of 2011, correct?

A. (Non-verbal response.)

Q. Let me direct your attention to later that day. Where were you that afternoon?

A. We were at my house in Melrose Park. Renee Vazquez and I were there.

Q. Okay. While -- That afternoon while you were in your house in Melrose Park with Renee Vazquez, what was Mr. Vazquez doing?

A. He was watching the news.

Q. And while Mr. Vazquez was watching the news, did he call your attention to anything that was on TV?

MR. CLANCY: Objection, Judge.

THE COURT: Overruled.

MR. CLANCY: May I have a sidebar? Judge, it's going to lead to more objections. If I could have a sidebar.

(Sidebar held off the record.)

THE COURT: The objection is overruled. You may continue your examination.

BY MR. VARGA:

Q. Ms. Rodriguez, what was the story on the news that Mr. Vazquez was watching when he called you

RR-33

VILLA_AV_002828

over?

A. Sure. It was the story of the slain officer.

Q. Clifton Lewis?

A. Yes, it was.

Q. And when Mr. Vazquez called you over to see the TV, did he say anything or comment about the news story that you were seeing?

A. Yes, he did. He was like, look, this is what Flip was talking about.

Q. All right. Ms. Rodriguez, after hearing the defendant make this statement about shooting a police officer, did you report this matter to the police?

A. No.

Q. Did you discuss or comment about reporting this matter to the police with Mr. Vazquez?

A. I did.

Q. When did you do that?

A. Immediately after I seen the news and when he called me over. Within two seconds of him saying this was what they were talking about, I suggested going to the police.

Q. And what did Mr. Vazquez say or do when you suggested going to the police?

RR-34

VILLA_AV_002829

A.   He threatened my life.

Q.   Did you go to the police?

A.   No.

Q.   Did you eventually -- Did you ever talk to police about this?

A.   I did eventually.

Q.   And that eventually would have been in March or so of 2013, correct?

A.   Yes.

Q.   What had changed between December 30th of 2011 and March of 2013 when you spoke to a police officer about this?

A.   Renee Vazquez had went to prison on some charges, and I felt safe at that point.  I felt he wasn't anywhere near me or anybody from his neighborhood wasn't anywhere near me to where I could be hurt potentially, so I just felt full confidence because he wasn't around to actually hit me if I would have did anything.

Q.   Did you go to the police immediately after he went -- after Mr. Vazquez went to prison?

A.   No.  I gave it considerable time.  I wanted to make sure that I wasn't bothered or anybody was going to ask me or say anything about anything in any

RR-35

instance and my face would have been well forgotten by these people.

Q. You say a considerable period of time. What are we talking about, days, weeks, months?

A. I would say months. He had been already arrested -- I mean, he got arrested, I mean, for months. I can't recall exact times. It was six years ago.

Q. When you came forward to talk to law enforcement, who was the first law enforcement person you spoke to?

A. I spoke with an officer named Officer Don Giuliano from the Franklin Park Police Department.

Q. And how was it that you brought this to the attention of Officer Giuliano?

A. Well, I just came out and just explained to him what I had knew, and he was a trusted officer in the neighborhood. There was some little gangbanger kids in the neighborhood, and I was single woman by myself. He would come up and check on me. They would, like, spray paint the buildings and stuff me near me, so he would stop by and ask me if I was okay. And I gained a lot of confidence with him, so I came to tell him what I knew.

VILLA_AV_002831

Q. After speaking with Officer Giuliano and telling him what you knew about Officer Lewis's murder, did you then speak with a Chicago detective, police detective named Tony Noradin?

A. I did.

Q. And in March -- on March 12th of -- one moment. In March of 2013

A. Yes.

Q. And where did that conversation take place?

A. In the Franklin Park Police Department.

Q. A couple of months later, directing your attention to July 11, 2013, did you speak with Detective Noradin again in the Franklin Park Police Department?

A. Yes.

Q. And was there an Assistant State's Attorney present by the name of Natosha Cuyler-Sherman?

A. Yes.

Q. Did Ms. Cuyler-Sherman take a statement from you?

A. Yes.

Q. A written statement?

A. Yes.

Q. And in conjunction with that written

RR-37

VILLA_AV_002832

statement, did you identify certain photographs?

A.   I did.

MR. VARGA:   If I could approach.

BY MR. VARGA:

Q.   Ms. Rodriguez, let me show you what we -- again, what we've marked as People's Exhibit No. 23 for identification.  Could you take a moment and review that, just peruse that document for me, and let me know when you are done?

A.   Sure.  I'm done.

Q.   Ms. Rodriguez, do you recognize People's Exhibit 23 and with the attachments 24, 25, and 26 as the written statement that was typed by ASA Cuyler-Sherman and that you signed on July 11, 2013, sometime after 5:35 p.m.?

A.   Yes.

Q.   Did you review the -- Did ASA Cuyler-Sherman review this statement with you in its entirety?

A.   Yes.

MR. CLANCY:   Objection, Judge.  Judge, objection. The photos are different than the rest of it.  That's a prior.  There's no reason to get into that.

THE COURT:   Sidebar please.

(Sidebar held off the record.)

RR-38

VILLA_AV_002833

THE COURT:  Objection overruled.  You may continue, Mr. Varga.

MR. VARGA:  Thank you.

BY MR. VARGA:

Q.  Ms. Vazquez --

A.  Rodriguez.

Q.  I apologize again.  People's Exhibit No. 24 for identification.  Is that a -- who is that a photograph of?

A.  Renee Vazquez.

Q.  And did you sign that?  Is that your signature on there?

A.  Yes.

Q.  People's Exhibit No. 25 for identification, Ms. Rodriguez.

A.  Yes.

Q.  And did you sign it?

A.  Yes.

Q.  In fact, that is noted with the word Flip.  Whose handwriting is that?

A.  That's mine.  Renee Vazquez.

Q.  The writing, Renee Vazquez is your handwriting too on Exhibit 24 for identification?

A.  Yes, sir.

VILLA_AV_002834

Q.    And People's Exhibit No. 26 for identification, which is attached, who is that?

A.    That's me.  It's a terrible picture.

Q.    And that's how you appeared on July 11 -- during the evening of July 11, 2011?

A.    Unfortunately, yes.

Q.    Ms. Vazquez, this statement --

A.    Ms. Rodriguez.

Q.    Jeez.  I keep -- sorry.  Ms. Rodriguez -- and I apologize again -- did anyone -- How were you treated by the police and the State's Attorney?

A.    With respect.

Q.    Anybody tell you what to say?

A.    No.  Never.

Q.    Let me direct your attention, Ms. Rodriguez -- I'll get it right this time.

A.    Thank you.

Q.    You're welcome.  -- to the next day, July 12, 2013.  Did you come to this building?

A.    I did.

Q.    And did you meet with a different State's Attorney, a man named John Dillon?

MR. CLANCY:  Objection.  Same objection I made at the last sidebar, Judge.

RR-40

VILLA_AV_002835

THE COURT:  Timely made, but overruled.

BY MR. VARGA:

Q.    Did you meet with Mr. Dillon?

A.    Yes, I did.

Q.    How did Mr. Dillon treat you?

A.    With respect.

Q.    And in talking -- And did you speak with Mr. Dillon privately?

A.    Yes.

Q.    After speaking to Mr. Dillon privately, did Mr. Dillon bring you into the Grand Jury room?

A.    Yes.

Q.    Did Mr. Dillon then ask you questions and did you answer questions relating to the homicide of Officer Lewis?

A.    Yes.  Of course.

MR. CLANCY:  Objection.

THE COURT:  Overruled.

MR. VARGA:  May I approach?

THE COURT:  Yes.

BY MR. VARGA:

Q.    While you were in the Grand Jury, did Mr. Dillon show you photographs?

A.    Yes.

RR-41

VILLA_AV_002836

Q.   Let me show you what we've marked as People's Exhibits 27 and 28 for identification.  Can you review those photographs and return it?  Directing your attention to the first one, People's Exhibit No. 27.  Did you identify this photograph while you were in the Grand Jury?

A.   Yes.

Q.   Who is this?

A.   Renee Vazquez.

Q.   People's Exhibit No. 28 for identification.  Did you identify this photograph while you were in the Grand Jury?

A.   Yes.

Q.   Who is this?

A.   Flip.

Q.   Flip?

A.   Yes.

Q.   The defendant?

A.   Yes.

Q.   Ms. Rodriguez, let me back up for a second.

A.   Sure.

Q.   You've indicated that Mr. Vazquez's threats to you when you suggested to go --

A.   I am sorry.  I couldn't hear you.

RR-42

VILLA_AV_002837

Q.    You indicated that when you told Mr. Vazquez that you talked to law enforcement about the defendant's involvement in the murder of Officer Lewis, you said he threatened -- Let me direct your attention back to that.

A.    Sure.

Q.    Did you view that threat as credible?

A.    Absolutely.

Q.    Based on what?

A.    He was already very physically abusive towards me.

Q.    So he had been abusive to you prior to December 30, 2011?

A.    Yes.

Q.    Had you reported that abuse to police?

A.    No.

Q.    Why not?

A.    I was afraid of him.

Q.    And that abuse that you are referring to, can you describe the abuse?

A.    Sure.

MR. CLANCY:  Objection, Judge.

THE COURT:  She can answer.  Overruled.

THE WITNESS:  Sure.

RR-43

VILLA_AV_002838

MR. CLANCY:  Foundation.  Date.

THE COURT:  Well, I think we are getting the foundation right now.  Go ahead.

BY MR. VARGA:

Q.    How many instances of abuse had occurred or been directed toward you by Mr. Vazquez prior to December 30, 2011?

A.    Too many to count.

Q.    Can you give us dates?

A.    I mean it started just maybe a month or two after dating him.

Q.    You indicated you started dating in August?

A.    August.  So maybe like October.  September, October.  I couldn't do anything.  I couldn't see my family.  I couldn't go out with my friends.  I couldn't do anything.  And when I did try, he would hit me.

Q.    One other thing, Ms. Rodriguez, you indicated that Mr. Dillon was respectful when you met with him before you testified in the Grand Jury?

A.    Yes.

Q.    Did Mr. Dillon or anyone tell you what to say?

A.    No.

RR-44

VILLA_AV_002839

MR. CLANCY:  Objection, Judge.

THE COURT:  Overruled.

THE WITNESS:  No.

MR. VARGA:  Thank you.  I have nothing further.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. CLANCY:

Q.    Where did you grow up?

A.    I grew up in a town called Northlake, Illinois.

Q.    Okay.  When did you move to the Chicagoland area?

A.    Never have.

Q.    Okay.  When did you move to Melrose Park or Franklin Park?

A.    Those are -- They touch each other. Franklin Park, Northlake, Melrose Park.

Q.    Okay.

A.    So my grandmother lives in Melrose Park and I would care for her.

Q.    Okay.  So you were in that area of the close Chicago suburbs your whole life?

A.    My entire life.

Q.    Okay.  Was Renee Vazquez the first

VILLA_AV_002840

gangbanger you dated?

A.    Yes.

Q.    He was?

A.    (Non-verbal response.)

Q.    Where did you meet him?

A.    Honestly, through his daughter.

Q.    Okay.  And his daughter's name is what?

A.    Tatiana Vazquez.

Q.    And how did you know her?

A.    I went to school with her.

Q.    Okay.  And she's -- She's obviously your age?

A.    My age, yep.  Yes, sir.

Q.    Okay.  And you were friends with her?

A.    From afar, sure.

Q.    What do you mean from afar?  You went to school with her, right?

A.    We went to school with each other.  That doesn't mean we were friends.  We were friends at a distance.

Q.    Okay.  How did this distant friend of yours introduce her to you -- introduce you to her father?

A.    Sure.  We used to walk in the same direction towards our houses.

RR-46

VILLA_AV_002841

Q.    Okay.

A.    And he drove up to her and, I guess, spotted me.

Q.    And did what?

A.    Said hello and initiated conversation.  So I mean --

Q.    Okay.  Did he take you off the street, put you in his car, and take you to his house?

A.    No.

Q.    Okay.  He didn't kidnap you off the street, right?

A.    No.  Absolutely not.

Q.    Okay.  So you and his daughter were walking home from school?

A.    When I met him, that was when we were adolescents.

Q.    Okay.

A.    And I ran into him again later on in the future with her.  We hung out maybe once or twice.

Q.    Where did you run into him at?

A.    I couldn't even recall.  With her.  We used to hang out and go to, maybe, a park.  So maybe at the park.

Q.    Okay.  You started dating in August of 2011,

RR-47

VILLA_AV_002842

correct?

A.    Uh-huh.  Yes.

Q.    And you dated until July of 2012?

A.    No.  He went to jail.

Q.    He went to jail in June of 2012?

A.    Right.  Yes.

Q.    Okay.

A.    Yes.  In that time.  Jeez, it doesn't seem that long.

Q.    Okay.  So it was, like, shortly after him going into custody, that's when the two of you broke up, right?

A.    Yes.  I ended it.

Q.    Okay.  So you dated him for around 10 months?

A.    Yes.  Just about.

Q.    Okay.  And you don't remember where it was that you met him, reconnected with him?

A.    I did say I remember.

Q.    That you were at a park?

A.    Yes, potentially.  Maybe just walking around, down the street with her.  He used to come and visit her all the time.

Q.    Okay.  And when did -- How long after that

RR-48

VILLA_AV_002843

meeting at the park did you start dating?

A. Almost immediately after.

Q. Almost immediately?

A. Yep. Yes.

Q. Okay. And I think you said that within a month or two months, he started beating you?

A. (Non-verbal response.)

Q. And he wouldn't let you see your friends?

A. Nope.

Q. Is that a no?

A. That's -- Yes, he would not let me see any of my friends.

Q. He would not let you see your family?

A. Yes. He would not.

Q. Okay. So from -- Your testimony is from August of 2011 until June of 2012 you had not hung out with your friends?

A. Yeah. Well, he would not let me see anybody.

Q. He would not let you hang out with your family?

A. No.

Q. Because if you did, he would beat you?

A. Yes, sir.

RR-49

VILLA_AV_002844

Q.   Okay.  Did you ever tell anyone about this?

A.   No.  Well, some of my friends, but not any law authorities or any officers.

Q.   Did any of your friends go to the police and say that you were being held captive against your will by Renee Vazquez?

A.   No, sir.

Q.   Okay.  Did any of your family members who hadn't seen you in 10 months try to find you?

A.   I never specified that I never got to see them.  He just wasn't okay with it, with me going myself.

Q.   Well, every time you did it, he beat you, right?

A.   He did.  But if I tried, which I didn't, I would just -- I was just compliant.  I was in my early 20's.  He was paying for my school.  I definitely was just compliant at that point.

Q.   You were how old?

A.   In my early 20's.  I was 21, 22 years old when I got with Renee.

Q.   You weren't a kid?

A.   I was sheltered so --

Q.   You were sheltered?

RR-50

VILLA_AV_002845

A.    Absolutely.  I had never even gone outside my house really.  Absolutely.  It was a very ignorant and adolescent time in my life.

Q.    Okay.  When you -- So how long after you started dating him did you realize he was a Spanish Cobra?

A.    Jeez.  Well, it wasn't too long after.  I mean, he did explain who -- where he came from.  I was under the impression that he was, like, retired, and he had nothing to do with those people anymore.  For that reason, it was only -- in my mind, it was okay.

Q.    Well, he wasn't the first member of a gang that you ever met, correct?

A.    Well, no.  Everybody's met a gangbanger once in their life.

Q.    You had gang members in your school, right?

A.    Sure.

Q.    In your neighborhood?

A.    Sure.

Q.    At the parks, right?

A.    Sure.  Absolutely.

Q.    You knew what the Spanish Cobras were, right?

RR-51

VILLA_AV_002846

A.    Sure.

Q.    You understood where they kind of hung out, where other gangs hung out, right?

A.    Not really.

Q.    Well, you knew what gangs were in your high school?

A.    I knew what they were.  Yeah, sure.  I didn't stay far away from them.

Q.    So when you started dating Renee, and you found out that he was a Cobra, you still dated him?

A.    After clarifying whether he was still active or not, it was definitely a factor on my mind as to whether I should be with this person.  I can admittingly say it wasn't my proudest moment in my life, but it happened.

Q.    Okay.  And then you were -- How many times have you been at Illusions where the only people who got in were Spanish Cobras?  How often had you been there?

A.    He would go because Renee sold drugs.  So he would go over there, and he would want to stop by.  I hated the neighborhood and the place, so I could say a solid maybe in that 10-month period of time, I would say maybe 20 times.

RR-52

VILLA_AV_002847

Q. Twenty times?

A. Sure. Maybe twice a month we frequented.

Q. And it doesn't open until 2:00 in the morning?

A. Sure.

Q. And the only males there are Spanish Cobras?

A. From my recollection, yes.

Q. And the only females there are girls who are dating Spanish Cobras?

A. Yes.

Q. Or hanging out with Spanish Cobras, right?

A. Yes. To my recollection, yes.

Q. Okay. And you said that you had learned though your relationship with Renee Vazquez that he was kind of a father figure to a lot of the younger Spanish Cobras, correct?

A. Yes.

Q. Including Flip, right?

A. Yes.

Q. Okay. And you learned that at that time that he was someone who had some rank in the gang, correct?

A. Yes.

Q. Okay. Do you remember what his rank was?

VILLA_AV_002848

A.    I don't.

Q.    Okay.  But he told you he was a ranking member, right?

A.    Yes.

Q.    He was a gang leader?

A.    I am not sure if he was a leader, but he did tell me that he doesn't have anything to do with that life at that point, but these guys looked up to him.

Q.    Okay.

A.    Yeah.

Q.    And you first talked to the police -- the first time you ever talked to a police officer about this was in March of 2013, correct?

A.    Yes.

Q.    Okay.  That was about eight months after Renee had gone away, right?

A.    Yes.

Q.    Okay.  At no time in that eight months did you tell the police about what you supposedly knew about the murder?

A.    No.

Q.    Okay.  And this officer that you said you were friends with, what was his name?

A.    Don Giuliano.

RR-54

VILLA_AV_002849

Q.   Okay.  And back in 2013 -- In March of 2013, how old was Don Giuliano, if you know?

A.   I am not sure.

Q.   Approximately?  20's?  30's?  40's?

A.   30's maybe.

Q.   At the time he was 30's right?

A.   Possibly.

Q.   Okay.  So he was a little bit younger than Renee?

A.   I'm not -- I could not specify that.  I don't know.  I never asked him his age.

Q.   Okay.  And how did you meet John -- Don Giuliano?

A.   He was one of the officers that did patrol the neighborhood that I lived in in Franklin Park.

Q.   Okay.

A.   And there was some knuckleheads that lived there that were spray painting the buildings and stuff like that.  And one of the buildings that got spray painted just happened to be mine.  There were townhouses in that neighborhood, so my townhouse got spray painted for no apparent reason.  It wasn't towards me or anything, but he did ask if I needed assistance or if there was something wrong.

RR-55

VILLA_AV_002850

And I told him that I never had a problem before with anybody. I think they just picked a random wall and spray painted it. And from that day forward, he would just check up on me once he realized I was a single mom, by myself, in kind of a finicky neighborhood.

Q. So your friendship with this Franklin Park Police Officer didn't start until after Renee went into custody, right?

A. Yes.

Q. Okay. And how often would this police officer come by your house after your boyfriend Renee went into custody?

A. I mean he would patrol the neighborhood every single day. I would see him maybe once or twice in a week, just according to my time schedule because I did work. So --

Q. And when you say you would see him, you would just see him patrolling the area or he would actually come to your house and check up on you?

A. No. He wouldn't just come to my house at all, honestly. It would be a matter of me, maybe, walking the dog. He'd drive by. Hey, how are you? Or if I am outside -- I used to spend a lot of time

RR-56

VILLA_AV_002851

outside. I'm an outdoors person. And he would see me and just pull up and, hey, how are you? How's everything going? I had full confidence with him for that.

Q. And you described him at one point as a trusted friend of yours, correct?

A. Absolutely. After time went on, yes.

Q. Okay. And how did the conversation come up between you and this trusted friend about what you testified had happened back in December of 2011 when you were at this gang bar, Illusions?

A. Sure. Well, I again, as I stated I had built confidence with him. This was something that had weighed on my mind and conscious since it happened. So at that point it just felt like it was the time to say something at that point. So I approached him with the -- what I knew.

Q. Okay. You said that you felt you had in time trusted him. This was from him saying hello to you as you are walking the dog?

A. Of course. He made me feel safer in that neighborhood by myself.

Q. Okay.

A. Absolutely.

RR-57

VILLA_AV_002852

Q.    And when you approached him with this information, when was that?

A.    I couldn't recall exactly to be honest with you.  It was within the days of me actually making a statement.  So I am sorry, times and dates are little skewed in my head.

Q.    Where was it?

A.    Where?

Q.    Yes.

A.    Did I approach him about this?

Q.    Yes.

A.    I approached him about this -- I told him I knew something.

Q.    So where were you when you told him that?

A.    I am getting there.  We were at my house -- at the townhouse that I stayed at.  He had driven by, again, like you said.  You know, he would stop by a lot.  So he had driven by and I explained to him that there was something I needed to talk to him about.

Q.    Okay.  When you say he had driven by, were you outside walking the dog again or did he come up to your house to check on you?

A.    He never came up to my house to check on me.  That's not something he ever did.  He would drive by,

RR-58

VILLA_AV_002853

and I had an alley. I had a parking spot. So he would drive by in the alley and see me there from time to time. I was always outside with my dog, so it had to have been one of those instances.

Q. Okay. And you just told him there is something I want to talk to you about?

A. Yes. Absolutely.

Q. Okay. And this was because this now in -- so it would have been right around in the month of March, beginning of March of 2013?

A. Somewhere in that area.

Q. Okay. And at this point it was almost a year and a half after --

A. (Non-verbal response.)

Q. -- what had happened at Illusions?

A. Yes, sir.

Q. And this was eight months after Renee had went to jail?

A. Yes, sir.

Q. And then at this point in March, it was weighing on your mind, and you had the conversation with the Franklin Park Police Officer?

A. Yes, sir.

Q. Okay. Have you ever been in the Franklin

RR-59

VILLA_AV_002854

Park police station before your interview there on March 12th of 2013?

A. No.

Q. You had never -- How long had you lived in Franklin Park?

A. Well, again, Northlake and Franklin Park are touching towns, so I have lived in that general area my entire life. Franklin Park, I had been living there for about a year and a half maybe, if that.

Q. Have you ever been arrested by a Franklin Park Police Officer?

A. No.

Q. Have you ever been arrested in Northlake?

A. No.

Q. Okay. When you went -- How is it that you ended up at the police station on March 12th of 2013 when you were interviewed?

A. I brought myself there.

Q. Okay. Did this Officer Giuliano ask you to come up there?

A. He did.

Q. Okay. And that -- Did he call you?

A. From what I recall, I believe so.

Q. How did he have your telephone number?

RR-60

VILLA_AV_002855

A.    I gave it to him.

Q.    When did you give it to him?

A.    I couldn't even tell you.

Q.    Well, you had given it to him way before March of 2013, correct?  He had your telephone number?

A.    Possibly.

Q.    Because he used to call you, right?

A.    No.  I said he used to come by.  I can't recall possibly if I gave it to him or maybe he handed me his business card and I had his number and that's how he got my number.  But you were asking for specifics, so I can't recall specifically.

Q.    Okay.  And then you have this conversation and then you go down to the police station and you are interviewed, eventually, by Chicago Police Officers, correct?

A.    Yes, sir.

MR. CLANCY:  If I could have one second, Your Honor.

THE COURT:  Yes.

                    (A short break was taken.)

BY MR. CLANCY:

Q.    In the times that Renee had abused you

RR-61

VILLA_AV_002856

physically, did you ever take any pictures of it?

A.   No.

Q.   Did he ever mark you up?  Did you have bruising on your face or on your body?

A.   Never on my face, but on my body, yes.

Q.   And you never took a picture of it?

A.   No.

Q.   You never told a single person about it?

A.   No.

Q.   Did you tell Giuliano about it, the police officer from Franklin Park?

A.   I -- After the fact.

Q.   After the fact of you gave the statement about what had happened at Illusions?

A.   Yes, because he asked why I had never said anything before.  And at that point, I had to bring up a painful past.

MR. CLANCY:  I have no further questions.

THE COURT:  Redirect examination?

MR. VARGA:  No, thank you.

THE COURT:  Thank you, Ms. Rodriguez.  You're all done.

THE WITNESS:  Thank you very much, Your Honor.

THE COURT:  Call your next witness.

RR-62

VILLA_AV_002857