# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


| TYRONE CLAY, | ) | Case No. 23 C 16798 |
| | ) | 23 C 16799 |
| Plaintiff, | ) | 25 C 1968 |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY F. NORADIN, | ) | Chicago, Illinois |
| | ) | November 24, 2025 |
| Defendant. | ) | 9:34 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:


For the Plaintiff
Edgardo Colon:            VITALE, VICKREY, NIRO, SOLON & GASEY LLP
                         BY:  MR. DYLAN BROWN
                         311 S. Wacker Drive, Suite 2470
                         Chicago, Illinois  60606


For Plaintiff
Tyrone Clay:             BONJEAN LAW GROUP, PLLC
                         BY:  MS. JENNIFER BONJEAN
                         233 Broadway, Suite 707
                         New York, New York  10279


Court Reporter:          MS. CAROLYN R. COX, RPR, CRR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Suite 2102
                         Chicago, Illinois  60604
                         (312) 435-5639
                         C.Cox.courtreporter@gmail.com


                    *   *   *   *   *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

For Plaintiff
Alexander Villa:        LOEVY & LOEVY
                        BY:  MS. JORDAN POOLE
                             MR. JONATHAN LOEVY
                        311 N. Aberdeen, 3rd Floor
                        Chicago, Illinois 60607


For Defendants
Anthony F. Noradin,
et al:                  BORKAN & SCAHILL LTD
                        BY:  MR. GRAHAM P. MILLER
                        20 S. Clark St., Suite 1700
                        Chicago, Illinois  60603


For Defendants
Andrew Varga
and Nancy Adduci:       O'CONNOR & BATTLE, LLP IL
                        BY:  MS. MICHELE BRAUN
                        111 W. Jackson Boulevard, Suite 1700
                        Chicago, IL 60604


For Defendants
John Dillon,
John Brassil, and
Franco Domma:           HINSHAW & CULBERTSON LLP
                        BY:  MR. ANSHUMAN AVINASH VAIDYA
                        151 N. Franklin Street, Suite 2500
                        Chicago, Illinois  60606


For the Defendant
City of Chicago:        NATHAN & KAMIONSKI LLP
                        BY:  MS. KATHRYN M. DOI
                        206 S. Jefferson Street
                        Chicago, Illinois 60661

APPEARANCES (Cont'd):


For Defendant
Cook County:                COOK COUNTY STATE'S ATTORNEY'S OFFICE
                            BY:  MR. JOSEPH A. HODAL
                            50 W. Washington Street, 5th Floor
                            Chicago, Illinois 60602


For Defendant
Garry McCarthy:             MOHAN GROBLE SCOLARO, P.C.
                            BY:  MR. ERIC S. PALLES
                            55 W. Monroe Street, Suite 1600
                            Chicago, Illinois 60603


For Defendant Village
of Franklin Park
and Don Guiliano:           MONTANA & WELCH, LLC
                            BY:  MR. THOMAS JOSEPH CONDON, JR.
                            11950 S. Harlem Avenue, Suite 102
                            Palos Heights, Illinois 60463

4

(Proceedings heard in open court:)

THE CLERK:  Cases 23 C 16798, Colon v. Noradin, 23 C 16799; Clay v. Noradin; and 25 C 1968, Villa v. Noradin.

THE COURT:  Everybody find a spot and kind of start on this end and go across.

MR. BROWN:  Good morning.  Dylan Brown on behalf of the plaintiff Edgardo Colon.

MS. BONJEAN:  Jennifer Bonjean, B-O-N-J-E-A-N, on behalf of the plaintiff Tyrone Clay.

MS. POOLE:  Jordan Poole on behalf of plaintiff Villa.

MR. LOEVY:  Jon Loevy also for the plaintiff Villa.

MR. MILLER:  Graham Miller on behalf of the individual CPD defendants other than McCarthy.

MS. DOI:  Kathryn Doi on behalf of the City of Chicago.

MS. BRAUN:  Michele Braun on behalf of Varga and Adduci.

MR. CONDON:  Good morning.  Tom Condon on behalf of Franklin Park and Officer Don Guiliano.

MR. PALLES:  Good morning.  Eric Palles on behalf of Garry McCarthy.

MR. VAIDYA:  Good morning, Judge.  Anshuman Vaidya. For the record, that's A-N-S-H-U-M-A-N, V-A-I-D-Y-A, on behalf of defendants John Dillon, John Brassil and Franco Domma.

THE COURT:  I'm going to try to work my way from

easiest to hardest. I'm sorry.  You were behind the screen.

MR. HODAL:  Joseph Hodal, H-O-D-A-L, on behalf of Cook County, and hopefully the last is the least.

THE COURT:  Nothing personal.  Sorry about that.

I want to kind of work my way from easiest to harder.

The motion to serve subpoenas which is -- I think that got filed in the Colon case; that's 16798 -- that's unopposed. That's granted.

There's a motion for leave to file a motion to compel with respect to Franklin Park.  Can't we just call the motion for leave to file the motion?

MS. POOLE:  We certainly could, your Honor.

THE COURT:  So who's Franklin Park?

MR. CONDON:  I am.

THE COURT:  Let me make sure I understand what you're looking for.  There's this person who gave a statement that supposedly implicated somebody, and the question is whether they had something over -- whether they had something over their head essentially.

MS. POOLE:  Yes.

THE COURT:  You're looking for the records of whatever it was they might have had over their heads?

MS. POOLE:  Yes, your Honor.

THE COURT:  You've been told so far that there isn't anything, but you're asking for a harder look?

MS. POOLE: We have not been told either way whether there is anything or not. We have asked specifically -- we learned during deposition that there was a potential arrest for a domestic dispute involving this witness and we have asked Franklin Park several times. They have not confirmed or denied whether these documents exist.

THE COURT: So?

MR. CONDON: Judge, actually, the email that I got asked for documents, and I communicated with plaintiffs' counsel and said, I don't think the documents that they are requesting are responsive to the requests that you already made. So she asked for a production request. I said they're not responsive. I don't have a problem looking for them, producing them, but I think it's actually a new request. It's not contemplated in the production that they are.

THE COURT: Do I have the original request that you think this falls within?

MS. POOLE: Yes, your Honor, in our motion.

THE COURT: Which number is it? I've got the request for production up in front of me.

MS. POOLE: Your Honor, it's in our motion. I think there's like four or five of them.

MR. CONDON: Judge, if I may?

THE COURT: Yeah.

MR. CONDON: She indicated in the email, it was 1, 5,

13, 14, 17, 26, 33, 37. And I will represent --

THE COURT: Can you do that backwards from memory?

MR. CONDON: Pardon me?

THE COURT: Can you do that backwards from memory?

MR. CONDON: Not from memory, but I could from reading.

THE COURT: From reading, anybody can do it.

MR. CONDON: So during the call, I went through and said, listen, I'm happy if they are -- we did respond originally that there weren't any documents. I didn't contemplate the request that she made with this new document with regards to an address. Specifically, one of them says -- her new request says, Arrest records or police reports relating to Destiny Rodriguez or ███████ Street, Apartment █. And I said I don't think that an address would be contemplated anywhere in there. And just for purposes of completeness, like I said, I recommend that she just seek relief to file an amended response or a supplemental response based upon information she just found out and I would answer it. But that it was contemplated by her production request, I don't think they're included.

THE COURT: Time out. So request 37, at least as it's reproduced in the motion for leave to file the motion, says, All documents, including but not limited to, documents comprising communications relating to the following witnesses.

There's a whole list of people, one of whom is this person Destiny Rodriguez.

MR. CONDON: Correct. Communications, and then it refers to communications as defined --

THE COURT: You left out several words. It says, "including but not limited to." All documents, comma, including but not limited to documents comprising communications, comma, relating to the following witnesses or purported witnesses, Destiny Rodriguez. It's not limited to communications. That's what "including but not limited to" means. It's not limited to.

MR. CONDON: Correct. But ███████ Street would not be a part of that. Excuse me -- ███████ Street.

THE COURT: Maybe I'm missing something. What am I missing?

MS. POOLE: Your Honor, in our communications with Franklin Park, we asked for documents related to Destiny Rodriguez or tied to an address we know that Destiny Rodriguez lived at during this period of time. I think that's what he's referring to.

MR. CONDON: The request says, Relating to Destiny --

THE COURT: Has anybody looked for documents relating to Destiny Rodriguez, full stop?

MR. CONDON: Yes. Yes. Since the time that we've had this conversation, my client has reviewed. There is one

document related to an incident from Destiny Rodriguez.

THE COURT: Okay. One document. Like a police report or something like that?

MR. CONDON: Correct, one document.

THE COURT: Have you produced that yet?

MR. CONDON: I did not. I got confirmation, I don't know, three and a half minutes ago while we were in the hall that there are no other documents. In addition, I will represent that there are no documents related to ███, the address either.

THE COURT: Produce the document. You'll see if it suffices, and then we'll move on to the next thing.

MS. POOLE: Thank you, your Honor.

THE COURT: Okay. So then the government responded to the thing on Title III saying they didn't have any problems so long as it's subject to the protective order, which I already ordered anyway. So I think that's kind of a closed issue. Does that sound right?

MS. DOI: Correct. I think I want to verify with the government that that includes or doesn't include grand jury materials.

THE COURT: Mr. DeWald is a careful man.

MS. DOI: He is.

THE COURT: We're talking about stuff that got produced in the underlying criminal case or at least one of the

underlying criminal cases.

MS. DOI: I don't think the grand jury materials were produced. And they certainly weren't part of the emails, your Honor. I can call -- I can communicate with him and just make sure that that's the government's position. If it's not, then I could ask him to do another --

THE COURT: Time out. Hang on a second.

MS. DOI: Sure.

THE COURT: So I ordered the government to give a statement of their position. They gave it to me.

MS. DOI: Okay.

THE COURT: Why isn't that the end of the day? So ordered. It's the end of the day. If they had any objection, they should have put it in there. So we're done with that.

So now the question I have then is does that -- are there any remaining issues on the plaintiffs' motion to compel, which was docket number 167, that I haven't already dealt with? I think I've dealt with all of them, but I don't know for sure.

MS. POOLE: Your Honor, I think the City and the plaintiff Villa are currently working out a few things, but I don't anticipate that the Court's intervention will be necessary on anything.

THE COURT: Does that sound right to you?

MS. DOI: Yes.

THE COURT: On the motion for entry of a

confidentiality order, I know there was part of that that relates to this *Monell* stuff.

MS. DOI: Right. I tendered the most recent version based on the last hearing that we had. I just cut out the part about snake doctor. I sent that over and I'm just waiting to hear.

THE COURT: When are you going to get back to them on that?

MS. POOLE: This morning. I was going to speak with her this morning. It should be fine, your Honor.

THE COURT: So I don't have to keep looking at them, I'm going to tell the clerk to terminate those two motions. Melissa, that's 167 and 172.

Is there anything else on the table other than the motion to bifurcate?

MS. DOI: I don't think so.

THE COURT: I don't think so either, but I'm asking.

Okay. Nobody is saying anything.

All right. Where is Area 5? Or where was Area 5 at the relevant time?

MS. DOI: Area 5 is in the 25th district, so on the northwest-ish side of the city.

THE COURT: It was -- we're talking about 2010 to 2014, that's the request. So five years. How many homicide -- nobody said this. How many homicides were there in the Area 5

12

during those five years?

MS. DOI: I mean, in our total for that four-year period, there's 258. But at some point, your Honor, just to be clear, I just want to be accurate, Area 5 became Area North in the middle of all of that, in 2012.

THE COURT: Fair enough.

MS. DOI: So it incorporated a bunch of other -- we just looked at the Area 5 district.

THE COURT: As it originally existed?

MS. DOI: Correct.

THE COURT: What is it that you're planning to do? Let's say you got all of this stuff. What are you doing with it? You're basically going to go and investigate whether the emails got produced in the criminal cases? Is that what we're talking about?

MR. LOEVY: Yes.

THE COURT: Anything other than that?

MR. LOEVY: To show that what happened here was in fact the policy and practice, systemically withholding.

THE COURT: Emails?

MR. LOEVY: There's several categories.

THE COURT: What are the categories?

MR. LOEVY: You got something called confidential RDs, which I've never heard of in my entire career. What it comes down is gang crimes.

THE COURT: I'm looking for a laundry list, not an explanation.

MR. LOEVY: File maker, confidential IDs, emails, and gang crime reports, which we believe would be encompassed within those subsets.

THE COURT: And in this case -- and I gather that the material we're talking about all got obtained through one of the subpoenas that were served by Villa -- is it Villa or Villa? I do that wrong every time.

MS. POOLE: He says it both ways, your Honor.

MS. DOI: I think it's Villa.

THE COURT: He's got to pick one.

MS. POOLE: I go with Villa.

THE COURT: Okay. And in this case, in the criminal case, cases, was there anything -- I'm just going to talk about emails. I don't know what file maker is, but whatever the other thing was you said. Was there anything in there that was exculpatory, and if so, what was it? Give me the highlights.

MR. LOEVY: Yes. The answer is yes, and there was a number of alternate suspects, investigation that wasn't documented. The way it's been explained to me is they got a couple witnesses when they were all done with their investigation, made it seem like that was the universe when, in fact, they had been mining, you know, dozens of witnesses, trying to create something.

14

THE COURT: Okay. And so essentially what you're looking to see is whether that happened regularly?

MR. LOEVY: Yes. You know, gang crimes has been a recurrent theme that they've kept their stuff out of the permanent files. In the old days, there was those files, and they never did find the files. This is the modern digital incarnation. They're really running parallel investigations, not disclosing.

THE COURT: Stop doing that. That's not helpful.

MS. BONJEAN: Your Honor, there's also drafts of reports in emails that contain exculpatory information that then gets removed.

THE COURT: Has anybody just like asked the question, hey, City, do you typically produce emails when you have a pending criminal case? Because my guess is the answer would be uhn-uhn. I mean, I'm wondering so that I'm not talking to you in a year and a half and we're dealing with motion to compel 47 on the *Monell* material where you're asking for probably something in the range of 8 digits left of the decimal point worth of documents, 250-some-odd homicides, all of the emails relating to all of those homicides. Assuming you get all of those in a year, on that one, two years from now, we're going to be dealing with motions to compel. And so has anybody thought about just saying, hey, do you guys produce emails? My bet is the answer is going to be no and then you got it, and

then we just move on from there.

MR. LOEVY: Well, that's half the equation, because we don't get emails in civil cases and I think Jennifer Blagg was extra aggressive to get them in this particular case. So I think I agree with your premise. That only gets you halfway there. Okay. They're withholding this category of documents. What we're trying to do is get them and show that, as a matter of course, it was exculpatory, and the other variable here --

THE COURT: Do you have to show that to prove the *Monell* part of it?

MR. LOEVY: You know, they're going to say so. They're going to say all you did was prove there's a bunch of emails you didn't get. You didn't prove that that would be material in any case. Your Honor, it's not like the photcopying problem when we went through this with *Fields*. You know, that's a big task. Producing emails is a relatively easy task.

THE COURT: Producing emails.

MR. LOEVY: It's digital.

THE COURT: You say as a non-producer of emails. You're producing emails on behalf of individuals who typically don't have a lot. When you're producing emails on behalf of organizations -- I don't want to go into detours -- it's an enormous undertaking because, at some point, somebody's got to review stuff, and then eventually, you got to review stuff. I

don't remember what the volume was of documents that Ms. Blagg got in response to these subpoenas, but it was south of a million, but it was a significant six-figure number. You got to look at all that stuff.

MS. DOI: It was over 2 million pages of emails that she's represented in court, correct.

THE COURT: Obviously, some of those are duplicates, but you don't know that until you look at them and some AI program, if one's been developed yet, goes through them for you or something. I don't know. I'm trying to figure out -- I'm trying to figure out some way that we're not looking at this when I'm, like, 79 years old. By the way, I'm 69. So what's the way to do that?

MR. LOEVY: We could wait six months for AI to make the program. Then we don't need any of us.

THE COURT: Then we don't need any of us. You just give it all to the AI and say, what's the answer?

Why five years? Why 250 homicides? Why do you need that many?

MR. LOEVY: It's a question of what is a statistically significant sample? We're willing -- and we usually present this to the City. We'll shrink it if you don't argue it's too small. You know, we can do it with 50 cases, and then they say, no, it's not enough. Really, the ball is back to them.

THE COURT: Let's just kind of play this string out.

Let's say it ends up being 50 cases. You get the 50 cases. So now you're on the homicide of Jane Smith and you now got all these emails on Jane Smith. It doesn't stop there, right? Because then you got to go to the state's attorney's office, you got to go to the defense counsel, you got to talk to everybody and try to figure out whether they got any of this, and you have to figure out whether it's exculpatory. You wouldn't necessarily know that without talking to other people and finding out whether it got disclosed in some other way. It doesn't stop with the emails. That's kind of step one of a multistep process.

MR. LOEVY: Which is the multistep process we have done in *Fields* and have done in other cases. We do the comparison. I'm not sure --

THE COURT: In *Fields*, we were talking about a couple of file cabinets in the basement.

MR. LOEVY: It was more finite. But I'm not sure you need to actually play it all the way through. The emails may show a pattern of non-documented things.

THE COURT: But you just said a second ago you're going to have to show that those are exculpatory because otherwise they'll just say it's a bunch of emails. By definition, it can't stop there. You're going to have to play it all the way out. You're going to have to essentially reinvestigate those other cases.

MR. LOEVY: On its face, the documents may be exculpatory and undisclosed, but I'm not going to disagree that we would want to tie it because they would maybe object and say you haven't shown it. You know, in 50 cases, it is a finite, doable thing, and it's not overwhelming. We've done it before.

THE COURT: Okay. What would you like to tell me?

MS. DOI: All I would say is that clearly is from the position of someone who didn't just undertake this process for 2 million pages of emails and going through and utilizing the same search terms that they are proposing, which are the RD number, the name of the decedent, and the name of the accused. So it still spit out over 2 million pages of emails. I would say --

THE COURT: Right, because there's probably no good way to come up with a more finite set of terms and connectors that narrows it down from that, right?

MS. DOI: Right. And I just would say we keep invoking *Fields* here, and obviously, your Honor and Mr. Loevy --

THE COURT: I saw the file cabinets. They were sitting right over there.

MS. DOI: Right. I've seen them too. That's the extent of my personal knowledge about the *Fields* case, but my reading of the *Fields* case --

THE COURT: My email has more documents in it than the

*Fields*' file cabinets do. My email for the last six months has more documents in it. My email probably for the last three months has more documents in it than the *Fields*' file cabinets. That's not what we're talking about here.

MS. DOI: Right. In terms of how this situation is uniquely different from *Fields*, you did have prosecutorial intervention and also prosecutorial oversight from the federal side, and then at some point, the Cook County prosecutors were involved.

THE COURT: Don't get me started on that one. Don't get me started on that one.

MS. DOI: I understand. But there was a restriction put on those CPD officers from disclosing at the time by the federal government under Title III.

THE COURT: You're talking about in the *Fields* case or this case?

MS. DOI: This case, how it's different.

THE COURT: I want to process that for a second, because I don't think I saw that in the response. So basically what you're saying is that this case could be not necessarily sui generis but different from the run-of-the-mill homicide case, if there is such a thing.

MS. DOI: We did point out in the reply, your Honor. We did also have it in another briefing on the motion to compel. I don't expect, obviously, the Court to remember

everything.

THE COURT: Good, because I don't.

MS. DOI: Also, Ms. Csicsila stood here on her response -- the government's response to Villa's initial motion to release the snake doctor documents and she explained to the Court --

THE COURT: By the way, for what it's worth, in *Fields* as well, there was a parallel federal investigation, so I'm not sure --

MS. DOI: I understand, but from my reading of that, it didn't appear that that involved the same type of task force investigation that was involved here where the federal government was --

THE COURT: Like I say, don't get me started on that. There was this whole loosey-goosey thing, but whatever.

MS. DOI: I understand.

THE COURT: So let's -- what's going on with the rest of discovery? Has anybody come within shouting distance of taking a deposition yet?

MS. POOLE: We've taken several, your Honor.

THE COURT: Yay. How many?

MS. POOLE: Three or four, and we have a couple more scheduled.

THE COURT: They're not officers, I'm assuming?

MS. POOLE: No, your Honor.

THE COURT: Not plaintiffs?

MS. POOLE: Third party.

THE COURT: Non-party witnesses, essentially?

MS. POOLE: Yes, your Honor.

THE COURT: And does somebody remember off the top of your head what the deadline for completing fact discovery is right now?

MS. DOI: Next August.

THE COURT: Next August. So basically eight months from now.

MS. DOI: And we also are going to be producing the snake doctor records, your Honor, and there's like tens of thousands of those. I mean, now that we have the blessing from the government. So that's -- not to pile on, but there still is significant discovery that, you know, is being produced.

THE COURT: So my real concern here -- I'm going to use a term that's in the Rules of Civil Procedure. I'm not using it in exactly that way. It's a proportionality issue. Whether it's just too much given what is entailed in basically just producing the material you're talking about, not to mention all of the follow-on that's going to have to be done on that. That's my concern here.

MR. LOEVY: What we propose in response, your Honor -- and we understand that -- but it is an important issue if, in fact, the Chicago Police Department has been systematically

withholding entire categories of documents that's important as a claim against the City, it's also important in this case because you don't have the empty chairs pointing at each other. Sometimes at the trial, the defendants come to court and say, you know, why are you blaming me?  It's the system.  And then we want to put the system on trial at the same time.

Back to your question about what do you do with this problem?  We've asked for a 30(b)(6) to better understand what is out there and what exists and maybe we could proceed with that 30(b)(6), and then maybe you should task the plaintiff to limit and make it workable and discrete what they're asking for and judge whether you're willing to do that.

THE COURT:  The 30(b)(6) would be with somebody with?

MR. LOEVY:  Do you want to speak to that, Jordan?

MS. POOLE:  Who is it likely that would get designated as the rep for that?

MS. POOLE:  Somebody within the City that knows the gang enforcement and gang intelligence division's storage procedures.

THE COURT:  Is there a 30(b) notice that's already been served?

MS. POOLE:  We haven't issued one, your Honor.

THE COURT:  Don't lean into that thing.  You're just going to hurt your back.

MS. POOLE:  Thank you.

We haven't filed a 30(b)(6) notice, your Honor. We just presented that as a potential compromise to some of these issues. We've also, your Honor, in our motion with respect to emails, I believe we presented a potential compromise with, like, 10 percent of the emails kind of doing a spot-check and reducing that burden as well.

THE COURT: Yeah, I'm not sure that spot-checks really work all that well okay.

When you say -- did you want to say something?

MS. BONJEAN: Yes, your Honor. I think we're using this case as a benchmark, but I can't imagine there's as much material in other homicide cases. So the burden or the proportionality may not be quite what the City expects. This case is, I think, unique in that.

THE COURT: Well, so if that's right -- I mean, who knows, it could be. I don't know. I mean, of the 250 homicides, probably a bunch of them ended up being dead ends where they didn't find a suspect and those might not have a whole lot of stuff in them, and there might be others where somebody got charged.

MS. DOI: I'm not certain at this point, your Honor. I just feel like --

THE COURT: What's the percentage of homicides that result in a prosecution? It's less than 50 percent, right?

MS. DOI: I am unaware of that number. I don't want

to speak to that.

THE COURT: Anyway, so the 250 is -- some of them are going to be cases where it just ends up being a dead end or a dry hole or whatever.

MS. POOLE: Your Honor, in addition to that, this is a situation in which we're only looking for homicides in which gang crimes was involved.

THE COURT: That would narrow it down to 247?

MS. POOLE: Most likely, your Honor, yeah.

THE COURT: I'm just saying.

Okay. So here's what I think we're going to do. I'm not prepared to do either of the two things that either side is asking me for at this point. Number one is to bifurcate. Number two is to just give us the stuff that we're asking for on five years. My concern on the bifurcation part is that I'm not satisfied that the options that have been offered are adequate, would balance all the factors. I'm not satisfied yet on that. On the plaintiffs' side, I'm not satisfied that the size of the undertaking is warranted.

And so this is what we're going to do. This is what we're going to do to start off with. Get your 30(b)(6) notice out for Mr. Loevy's comment about understanding the types of records there are and whatnot. Here's what you're going to do. You're going to randomly pick five homicides. When I say random, I mean random. That doesn't mean you go through and

then look up in the paper and say which ones, you know, result in something. You're going to randomly pick five homicides from area whatever it is, 5, during the years in question. You're going to get a sense of the volume of material there is from those five. And then you're going to come back and talk to me, because then I'll have a little bit better idea of how much we're talking about. You'll tell me when you tell me that whether this was a homicide that ended up resulting in a prosecution or not. I mean, you'll be able to figure that out easy enough.

If I tell you I need you to do that within the next 30 days, do you think that's doable?

MS. DOI: Yes.

THE COURT: Okay. Do it within the next 30 days. Well, just do it before the holidays, and I'm going to have you come back after the first of the year. So let's say January the 7th at 9:30.

Anything else anybody wants to talk about this morning?

MR. LOEVY: Not from the plaintiffs.

MS. DOI: I just have the one. I was hoping to avoid the issue of issuing a motion for leave to file subpoenas.

THE COURT: What is it? I know stuff keeps popping up at depositions. I get that.

MS. DOI: I understand. The plaintiff Villa

supplemented their discovery response to the City's interrogatories about any injuries suffered in jail. We subpoenaed the hospital that he identified, which was Stroger. Stroger has no records on Villa.

THE COURT: You have to go somewhere else or something?

MS. DOI: Yeah, we're going to work that out.

THE COURT: You don't need leave to do that. To me, that's within the scope of what I already gave you.

MS. DOI: I appreciate it. Thank you.

THE COURT: Anybody else got anything?

Thanks for coming in. Take care.

(Proceedings concluded at 10:00 a.m.)

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ Carolyn R. Cox*_____          November 25, 2025
Carolyn R. Cox, RPR, F/CRR
Official Court Reporter