**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER VILLA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25 cv 01968 |
| v. | ) | |
| | ) | |
| ANTHONY NORADIN, SAMUEL CIRONE, | ) | Honorable Judge Matthew F. Kennelly |
| WILLIAM BROGAN, DENIS WALSH, JOEL | ) | |
| KELLER, JOHN GRAHAM, ALBERT PEREZ, | ) | |
| DONALD FALK, JAMES GILGER, JOHN | ) | |
| HILLMAN, TIMOTHY MCDERMOTT, MARC | ) | |
| LEAVITT, HECTOR ALVAREZ, JOHN FOLINO, | ) | |
| MAURIZIO INZERRA, DEMOSTHEN | ) | |
| BALODIMAS, GARY YAMASHIROYA, | ) | |
| CHRISTOPHER KENNEDY, JAMES SANCHEZ, | ) | |
| MATTHEW CLINE, CHARLES DALY, ED | ) | |
| ZABLOCKI, GERRY MCCARTHY, NICHOLAS | ) | |
| ROTI, JOSEPH GORMAN, SCOTT DEDORE, | ) | |
| MICHAEL DYRA, MICHAEL NUNEZ, JOEL | ) | |
| BEMIS, SCOTT KORHONEN, JOHN | ) | |
| ESCALANTE, LEO SCHMITZ, SHEAMUS | ) | |
| FERGUS, ROBERT BARTIK, RICHARD | ) | |
| GREEN, NICHOLAS SPANOS, the CITY OF | ) | |
| CHICAGO, FRANCO DOMMA, NANCY | ) | |
| ADDUCI, ANDREW VARGA, JOHN BRASSIL, | ) | |
| and COOK COUNTY, DON GUILIANO, the | ) | |
| VILLAGE of FRANKLIN PARK, | ) | |
| | ) | |
| Defendants. | ) | |

**STATEMENT OF THOMAS J. CONDON, Jr., IN RESPONSE TO**
**<u>MOTION FOR SANCTIONS</u>**

Defendants Village of Franklin Park and Donald Giuliano have filed a response to the

plaintiff's motion for sanctions arising out of the late discovery of a document—Incident Report

201300005358 ("Morin-Giuliano Report")—that had not previously been produced in this case.

Thomas J. Condon, Jr., submits this statement in response to plaintiff's motion, as well:

1.      I am an attorney licensed to practice law in the State of Illinois since 2002 and the District of Columbia since 2004. I offer this statement on the basis of my personal knowledge.

2.      I serve as counsel for defendants Village of Franklin Park and Donald Giuliano in this case. I bear principal responsibility for preparing those defendants' pleadings and motions in this matter, and I bore principal responsibility for working with defendants in connection with their Rule 26(a) disclosures and their responses to discovery requests.

3.      As the Court noted during the November 24, 2025, hearing, my interpretation of plaintiff's requests for documents was incorrect and unduly narrow. I placed unconditional demands in the context of what I understood to be pertinent and overlooked the all-inclusive language of at least one demand that requested documents pertaining to interactions with Ms. Rodriguez, without restrictions as the subject matter of the request.

4.      I apologize for my error. I wish to assure the Court that there was no intent to delay or impede discovery.

5.      I joined my firm in June 2023. In March 2025, the firm began its handling of this case. Upon receipt of the complaint, the firm, consistent with its typical course of practice, notified the clients of the existence of the lawsuit, the need to preserve evidence relating to the matter, and a request for the clients to assemble pertinent documents.

6.      In early April 2025, I was asked by my partner to assume responsibility for the defense of this matter. On April 11, 2025, I spent the entire day (more than 7 hours) reviewing the file, including the documents that had been assembled by the defendants in response to the firm's initial communications, and meeting with the clients to familiarize myself with the matter and handle the defense. Director of Police Witz was my client contact with Franklin Park.  I filed my appearance the following Monday, April 14, 2025. (Dkt. # 37)

7. My clients had already provided the Morin-Giuliano Report and the Giuliano Report to the firm before I met them, and I knew about the two documents when we spoke. Director of Police Witz did not have any recollection or knowledge of the events. Officer Giuliano remembered the event and his recollection of the events was solidified by his review of the Giuliano Report. We began our conversation with a more general discussion of all of the people involved in the case and, in particular, Destiny Rodriguez, as well as a discussion of what my clients knew or had to do with the homicide investigation at the center of the complaint.

8. My clients had no knowledge of the underlying homicide investigation or prosecution other than the facts described here. There are no files indicating or suggesting that Franklin Park had any connection to the matter. Officer Giuliano remembered the incidents and confirmed the accuracy of what he had written in the Giuliano Report, and he remembered contacting a representative of the Chicago Police (defendant Noradin) and then arranging to introduce Destiny Rodriguez to the Chicago Police for an interview and thereafter arranging to advise Destiny Rodriguez to respond to contact requests from others for meetings with prosecutors and for court.

9. I asked if the Morin-Giuliano Report and the Giuliano Report both related to the homicide investigation, and neither Officer Giuliano nor Director of Police Witz saw any connection between the Morin-Giuliano Report and the homicide investigation.

10. I also spent my initial week trying to get a better understanding of the case and its background. On April 15, 2025, I contacted plaintiff's counsel to try to gain a better understanding of the allegations relating to my clients. I remember raising my concerns about group pleading and discussing with counsel the likely course of a motion seeking dismissal on those grounds, and I remember my client Officer Giuliano being characterized as having served as a "shepherd" or the

3

like for Destiny Rodriguez, which was consistent with Officer Giuliano's general recollection that, after introducing Destiny Rodriguez to the Chicago Police, his interactions consisted of relaying requests from the police and prosecutors to contact them when they were unable to get in contact with them.

11. I also spent time during the week reviewing some of the discovery materials that had been produced in the companion cases, but what I reviewed was not very helpful. On April 21, 2025, I moved for an extension of time for my clients' answer (Dkt. # 44), granted that day (Dkt. # 46).

12. In connection with the preparation of the answer and my clients' Rule 26(a) disclosures, I reviewed County and Chicago productions of discovery documents in the related cases and tried to get a better understanding of the background for the case, because my clients had nothing to provide me concerning the investigation and prosecution beyond the Giuliano Report and the limited recollections that it prompted for Giuliano. I understood what my clients understood about their involvement, but these civil cases arise out of multiple investigations and prosecutions, post-conviction proceedings, and exoneration decisions that did not concern my clients, and my energy and focus was to getter a better understanding of the "Lewis Homicide Investigation," as people were calling it.

13. On May 16, 2025, defendants made their Rule 26(a) disclosures. I remember my decision not to produce the Morin-Giuliano Report. At the time, my clients had advised me that there was no connection between the Morin-Giuliano Report and the Lewis Homicide Investigation. I anticipated that Officer Giuliano would testify to establish that fact and would likely present the Giuliano Report in his defense, but I did not expect to introduce documents relating to what Officer Giuliano did on other matters.

4

14.     Had I known then what I understand now to be the facts and the contentions of the case, I would have included the Morin-Giuliano Report as part of my clients' Rule 26(a) disclosures, but, when I worked with my clients to prepare their disclosures, I did not believe the Morin-Giuliano Report would be offered in evidence in support of my clients' defense.

15.     The complaint accuses defendant Giuliano of participating in the falsification of statements, and the only "statement" in the Lewis Homicide Investigation procured by Officer Giuliano is the document he prepared, when he summarized what Rodriguez had said to him on March 11, 2013. I did not consider the Giuliano Report to be a "statement" in the context of a criminal investigation, where a witness or defendant prepares and signs a document or sits for a transcribed interview, and I expected to introduce the Giuliano Report into evidence to establish the extent to which my client participated in the flow of events that led Rodriguez to meet with Chicago Police and, thereafter, the State's Attorney's Office in connection with the investigation and prosecution of Villa.

16.     My understanding at the time of the Rule 26(a) disclosures was that the Morin-Giuliano report documented an interaction which was initiated by the police late in the evening of March 10, 2013, where Destiny Rodriguez had been identified in connection with an investigation that "targeted" Rodriguez' roommate. That report, prepared by defendant Giuliano on behalf of Tod Morin and himself, described an incident in which the police came to speak to the roommate a little after 11:00 at night because they were investigating a stolen-goods case and reports that the roommate had pawned stolen goods.

17.     The Morin-Giuliano Report does not describe any resistance to entry, and it contains the roommate's admission that she had pawned the goods in question and her explanation of the circumstances and her lack of knowledge that the goods had been stolen. During the visit,

the police noticed the presence of cannabis, and, with the occupants' consent, the police completed a search, discovered cannabis and equipment associated with distribution, and a holster and bullets. Before the search, the occupants had acknowledged their use and occasional sale of cannabis, and Rodriguez advised officer Giuliano that an ex-boyfriend had left bullets with her that she kept in her safe, together with its holster. The officers took possession of the items they needed, and they entered a report indicating their recommendation not to bring any charges.

18. To my mind, the Morin-Giuliano Report related to a separate matter, prepared by two officers, not one, that, by its terms, described an event that would not likely have given rise to prosecution. At most, Rodriguez happened to be in possession of small amounts of plastic bags and cannabis and asked the police to take away bullets that were not hers and not wanted, and that event was not the purpose or focus of the police visit. As to the concerns the officers might have had about Rodriguez' roommate that led them to come to the apartment, the Morin-Giuliano Report indicates the officers' recommendation not to pursue charges against her despite her acknowledgment that she had sold the goods that had been stolen.

19. In my early discussions with the clients, I asked about Destiny Rodriguez and connections between her and the defendants. I had a number of discussions, and I know my first client meeting would have included Destiny Rodriguez, but, unless otherwise noted, I cannot separate what topics came up in what discussions, whether telephonic, with the clients at the police department at planned meetings, or in more casual interactions when I would be at the Police Department on other matters and would run into Director of Police Witz. Through the course of my meetings and discussions, the repeated information and confirmations I received from my clients, with the benefit of the incident reports we had, was that Officer Giuliano had a recollection of the conversation reported in the Giuliano Report and of contacting the Chicago Police,

introducing Rodriguez to the Chicago police at the Franklin Park station for her to be interviewed, and working with police and prosecutors to contact her when they were unable. Giuliano indicated that he played no other role or had any other connection to the Lewis Homicide Investigation.

20. After my clients made their initial disclosures and filed their answer to the complaint (Dkt. # 91), my focus was on preparing for the amount of work that this case was going to need. I knew that there would be a massive amount of discovery materials from others that our office would need to be able to process, and, in June, my firm hired a paralegal specifically for purposes of the discovery and case-management needs of this case, and I met with third-party vendors in anticipation of the receipt, coding, and processing of what we would be receiving. In late June, I created documents for draft discovery responses, but I do not remember if that consisted of anything more substantive than opening and naming a word file or filling in the other side's requests as the shell for what will be provided later. In my firm, the attorneys manage their own drafting and prepping of our documents, and it would have been within my regular practice simply to open a document in anticipation of preparing the response to a discovery request without intending to work on substantive responses at the time, and I cannot specifically recall creating the documents.

21. For the bulk of July, my firm was still indexing and processing information provided by others, but, by the end of the month, I was working with the clients to prepare responses to plaintiff's discovery requests. In the last week of July and the first week of August, I had a number of interactions with the clients about the completion of discovery responses, the accuracy of the information, and the like, but the bulk of my efforts concerned personnel and financial issues, as I believd I understood the underlying facts known by my clients.

22.     I don't know when in the process from my initial interview to my clients' discovery responses were filed that the issue arose, but I do recall a discussion I had with Officer Giuliano and Director of Police Witz when we were trying to identify what the clients knew about Destiny Rodriguez and, in that conversation, Officer Giuliano raised a possibility that Destiny Rodriguez might have been a confidential informant for the Franklin Park Police but he did not know. I do not remember the date or other foundational facts about the manner of our communications or the context, other than I remember Officer Giuliano floating the possibility and asking/directing the clients to follow up. I remember discussing the fact that, if Destiny Rodriguez had been a confidential informant, there would be a file for her and that the file would be kept in a file room within the Police Department that was kept locked.

23.     At the time, I understood that Officer Giuliano did not have access to that room and the cabinets in which the reports would be located, but Director of Police Witz did. Without being able to recall all the foundational facts that I would like to be able to provide the Court regarding the timing and manner, I do recall Director of Police Witz advising that the room and cabinets had been searched for potential files concerning Destiny Rodriguez in the locked portion of the file room after Officer Giuliano speculated about Destiny Rodriguez having been a confidential informant, but the search did not lead to any discovery of files.

24.     Director of Police Witz' information led me to think that, in a search for potential connections, Officer Giuliano speculated about a possible reason why there might be a connection, but review of the files debunked it, and the facts remained as they always had—the Giuliano Report related to this case, and the Morin-Giuliano Report related to another matter.

25.     I do not recall whether that exchange about the non-existence of a file designating Destiny Rodriguez a confidential informant occurred in my first interactions with my clients in

April or in connection with their discovery responses in late July or early August, because, at the time, the news was in the nature of someone confirming that there was no weight to speculation offered by someone who was trying to remember if he had remembered someone in a particular way. As part of my work in understanding the file, making initial disclosures and preparing discovery responses, I met with the clients at the Franklin Park Police Department to talk through individual requests topics and confirm the clients' understanding and answer to each. We also spoke by phone. We also talked about what the clients knew and did not know about the Lewis Homicide Investigation, the allegations in the First Amended Complaint about how the Chicago Police conducted the investigation and the anti-gang operations set forth in plaintiff's allegations, and, of course, Destiny Rodriguez. The only information from the files, as reported to me, consisted of the Giuliano Report, the Morin-Giuliano Report, and the documents comprising the remainder of the defendants' document production. The only document withheld that I knew was being was the Morin-Giuliano Report.

26. In connection with the requests for documents, my mind remained fixed on the Lewis Homicide Investigation. Neither Franklin Park nor Officer Giuliano played any role in the matter beyond the statement already provided in the Giuliano Report, and my focus while directing the search for documents was the Lewis Homicide Investigation. That was why I believed the withheld document was not responsive because, to my understanding, the incident described in the Morin-Giuliano Report was not part of the Lewis Homicide Investigation.

27. I prepared final discovery-response documents for my clients' review, and I sent them to the clients. Before placing the clients' electronic signatures on the responses, I confirmed that each client was willing to sign the responses.

28.     I put too much of my focus into plaintiff's document requests. The court made it clear when I tried to defend my reading of the requests by pointing out the all-inclusive, unconditional nature of Request 37. I was wrong, and I apologize.

29.     I made an incorrect interpretation of plaintiff's discovery requests as to one document. At the time of my clients' responses to plaintiff's discovery requests, I was not aware of any other potentially responsive documents.

30.     At the time of the November 24, 2025, court hearing, I was aware of one document that my client had not yet produced. The document of which I was aware contained references to other documents, but, based upon the representations I had received from Director of Police Witz' email to me, I believed and represented to the court that no other documents existed.

31.     Thereafter, when asked by plaintiff's counsel about the documents referenced in the document I produced I contacted Director of Police Witz and renewed plaintiff's requests for what they believed to be missing and for metadata on the Morin-Giuliano Report.

32.     In the time after my clients' discovery responses and the court's direction, I have learned that my clients' production in this case was not complete.

33.     Most significantly, I have been advised that Destiny Rodriguez was, in fact, a confidential informant and that the Franklin Park Police opened a file for her that had been in the locked file room that Director of Police Witz directed to be examined.

34.     I learned that fact January 13, 2026 because, since mid-December, I had been anticipating a motion on a discovery dispute relating to the production of the Morin-Giuliano Report and had been working with my clients to initiate and complete a new search of everything. I now understand, for example, that Destiny Rodriguez presented trial testimony that offered different details about her interactions with Officer Giuliano than reflected in the Morin-Giuliano

Report. I understand plaintiff's suspicion that the episode described in the Morin-Giuliano Report led to what plaintiff sees as tainted evidence, and I understand that the deposition testimony of Vasquez intimates that the relationship between Officer Giuliano and Destiny Rodriguez played a role in the unfolding of events.

35. Even without knowledge, yet, that the Franklin Park Police files included Destiny Rodriguez' designation as a confidential informant, I could see why my clients would want to present the Morin-Giuliano Report as evidence and should have included it with their Rule 26(a) initial disclosures.

36. For the reasons stated above, the Morin-Giuliano Report does not suggest to me that the event gave rise to a source of pressure or coercion that would lead someone to offer false testimony against another, and I would expect my clients to present the Morin-Giuliano Report to establish that fact. In addition, even if the former boyfriend referenced in the Morin-Giuliano Report proved to be Vasquez and that fact led Destiny Rodriguez to provide the information contained in the Giuliano Report, the Morin-Giuliano Report describes the interactions between Officer Giuliano and Destiny Rodriguez relating to the bullets contained in a safe and her ex-boyfriend. That description would be offered to reflect not only the non-threatening circumstances of the interaction but also her initiation of the discussion of the bullets after both she and her roommate consented to a search of the apartment.

37. Previously, I did not see those potential connections. My work with the clients to revisit discovery was not the result of that insight, but my work now has a better understanding of the underlying prosecution and how the parties see my clients fitting into this case. My work with the clients to revisit discovery arose out of the meet-and-confer conference about discovery that the parties held December 18, 2025.

11

38.     After that conference, I knew that there was likely going to be a discovery motion, and I wanted the clients to be in a position to report to the court and the parties that they were in full compliance with all discovery and disclosure obligations, including requests for metadata and anything else, and could explain their discovery and disclosure decisions that they needed to explain or defend.

39.     Aside from the disruptions of the holidays, my focus, with the assistance of other members of the firm, has been to address open issues. The defendants are submitting their response to plaintiff's motion for sanctions separately from my statement, and I will leave it to them to describe their efforts since mid-December to correct for what we have learned.

40.     After court January 7, 2026, I continued my efforts to bring the clients into compliance.

41.     The day before, on January 6, 2026, I had contacted Franklin Park's new Chief of Police, Thomas Ferris, regarding the discovery responses in this case.  A discussion was held regarding the need to conduct a search to verify all of the searches for documents requested in discovery. (I believe Chief Ferris had been sworn into office the day before.) On that day, he located some documents which were specifically responsive to the request which had been the subject of the motion to compel.

42.     On January 8, 2026, other lawyers from my law firm and I spoke by telephone conference with Chief Ferris and the IT Director, Dan Corcoran, and directed them to conduct a new comprehensive search of every conceivable source of pertinent information. I went to Franklin Park on January 12 and 13, 2026 to work on the discovery issues.

43.     On January 13, 2026, I was advised by Chief Ferris that he personally conducted a search of the room in which the Police Department keeps its files on its confidential informants,

and that he had discovered a file that identifies Destiny Rodriguez as a confidential informant effective the same day as the Giuliano Report. Copies of all recently located documents including the Rodriguez confidential information file, will be provided to the parties prior to the January 21, 2026 court hearing.

44. Upon learning of the discovery of the Destiny Rodriguez file among the department's confidential informant files, I directed the Village to examine all of its confidential informant files to see if there are any such files for any of the individuals named in plaintiff's discovery requests, and, if any such files are located, to send them to me for production to the parties.

45. The motion for sanctions speaks to my conduct after the November 24, 2025, court hearing concerning the production of documents ordered by the court. In response to the court's direction, I produced the Morin-Giuliano Report. I had the report, and I produced it.

46. I was then contacted by plaintiff's counsel, December 5, 2025, advising that the Morin-Giuliano Report referred to additional documents and requesting production of them. I contacted Director of Police Witz, and he provided me the evidence report and indicated that the consent to search forms also referred to in the Morin-Giuliano Report had been destroyed in 2013. I forwarded the evidence report to counsel on December 11, 2025, and reported that I had been advised that the consent to search forms had been destroyed in 2013.

47. The motion for sanctions also sought an explanation for the number of file interactions revealed by the metadata on the Morin-Giuliano Report. I have determined the names of the persons who accessed the document and confirmed that the interactions principally related to reviews of the document conducted in response to requests under the Freedom of Information Act, presented in some instances by journalists and in other instances by plaintiff's representatives.

Although I have represented units of government on FOIA matters and my firm has an attorney who assists Franklin Park on FOIA matters, I do not handle those duties for Franklin Park, and I was not aware that people were requesting documents from Franklin Park that led employees to access the Morin-Giuliano Report.

48. The explanation of the metadata is set forth as part of the defendants' response to the motion for sanctions.

49. I apologize to the court, the plaintiff, the defendants, and my colleagues that I had reviewed plaintiff's requests for documents with a focus on the Lewis Homicide Investigation and my belief that my clients' alleged role in that investigation related to statements and trial testimony that my clients did not prepare or see her present. I had no intention of slowing down or disrupting discovery, but, despite the phrase "including but not limited to" and the word "any," I looked for documents pertaining to the Lewis Homicide Investigation.

50. I did not know of any designation of Destiny Rodriguez as a confidential informant and had been specifically advised to the contrary, and I did not know that Destiny Rodriguez had even mentioned Officer Giuliano's name during the criminal trial, let alone that her description of her interactions with him had been the focus of the cross-examination she faced.

51. Had I known any of that at any time, I would have produced everything in my clients' possession that had anything to do with Destiny Rodriguez from the inception. I think the documents help my clients, regardless of their impact on others: collectively, they establish that Officer Giuliano had only a discrete number of interactions with Destiny Rodriguez, all reported and culminating in her designation as a confidential informant. Further, the documents establish that what Officer Giuliano saw, what he and his partner concluded when they determined not to make an arrest of anyone, and what Giuliano heard Destiny Rodriguez say were all recorded in

14

documents prepared contemporaneously by Giuliano before he even knew the name of the person that Destiny Rodriguez knew by nickname. They provide a basis to measure the extent to which Destiny Rodriguez changed her testimony thereafter and confirm the lack of any involvement in those changes, regardless whether the changes were understandable, reasonable, candid, or deceptive and regardless of the impact of Destiny Rodriguez' testimony within the criminal case.

52. My sole focus since receiving plaintiff's motion for sanctions has been to ensure that all responsive documents have been produced. Interrogatory answers will be supplemented, as will my clients' initial disclosures.

53. Had I known there is a file in the Franklin Park Police Department that establishes Destiny Rodriguez as a confidential informant, I would have advised my clients, at a minimum, to produce that document. It is responsive to an explicit discovery request, and with the Morin-Giuliano Report lies at the heart of the motion for sanctions.

54. I understand and acknowledge that my duties of disclosure are not excused by the level of my familiarity with either the controversy at hand or the client's participation in the underlying events. My reading of plaintiff's complaint presented a comprehensive portrayal of an alleged course of conduct centered on the Chicago Police and some prosecutors arising specifically from the Lewis Homicide Investigation but practiced more generally throughout the community, with one connection to Franklin Park relating to one officer's alleged procurement of a false statement from a witness at trial. The Giuliano Report addressed the issue.

55. If my clients had played any further role in the underlying investigation and prosecution, they might have had a reason to remember what role Destiny Rodriguez ultimately played in the prosecution, what she said at trial, and the like. Her trial testimony included explanations offered during cross-examination to describe why she had spoken to Officer Giuliano

15

and efforts during cross-examination to suggest that Destiny Rodriguez had received a benefit in exchange for coming forward rather than having chosen to come forward in the manner suggested by the Giuliano Report. She also offered direct-examination testimony, which presented more information than summarized in the Giuliano Report.

56. If my clients had been involved in the underlying homicide investigation and prosecution and understood that Destiny Rodriguez' testimony presented details never shared with Officer Giuliano regarding the events summarized in the Giuliano Report, I would have included the Morin-Giuliano Report in defendants' Rule 26(a) disclosures and would have argued from the Morin-Giuliano report that the officers themselves saw no basis to justify arrest, even the woman who admitted pawning goods, did not elicit nearly the information from Destiny Rodriguez that she presented at trial, and played no part in any discussions or interactions that led to the testimony that Destiny Rodriguez offered.

57. From my perspective, my clients have been attached to a massive case, involving enormous amounts of data, focused on what plaintiffs in the three related cases see as an informally (or worse) established group effort to inflict harm, fear, and worse on a community under the belief or claim that extreme measures, including secrecy, were justified in view of what that group saw as its mission or objective. My clients had nothing to do with any of that, and it is in their interest to establish as quickly and unambiguously as possible that their involvement with Destiny Rodriguez and the Lewis Homicide Investigation consisted of passing along information of potential interest and nothing substantive thereafter.

58. If there were any question whether my clients' interactions with Destiny Rodriguez included times when my clients might have been able to force or unduly persuade Destiny Rodriguez to tell a lie in order to obtain a wrongful murder conviction, I believe it would have

16

been in my clients' interest not only to tender the Morin-Giuliano Report but use it to debunk the suggestion that they exerted influence on anyone, let alone someone in a community already afraid of coming forward, cooperating with police, or the like. I believe that the Morin-Giuliano Report serves my clients, regardless of its impact on any other defendants, because it confirms the limited involvement of my clients in the investigation and the absence of any leverage even to hope to exert against Destiny Rodriguez.

59.    This is not to excuse my misreading of the discovery requests, but to assert the absence of any malicious or devious intent in doing so.

60.    Although I have had the assistance of counsel in preparing this Statement, I stand by it and present it as my own, understanding that I make this Statement not only as a target of a motion but also as an officer of the court.

61.    I offer this Statement as my sole response to plaintiff's motion for sanctions. I do not believe that my error warrants sanctions against me.

62.    Finally, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that this statement is true and correct.

Dated and executed January 16, 2026:

/s/ Thomas J. Condon, Jr.
Thomas J. Condon, Jr.

Prepared with the assistance and filed by counsel

/s/ Joseph E. Tighe
Attorney for Thomas J. Condon, Jr.

Joseph E. Tighe—ARDC # 6181461
ALAN J. MANDEL, LTD.
7520 N. Skokie Blvd.
Skokie, IL 60077
(847) 329-8450
joe@mandelaw.net

17